2024 IL App (3d) 230663

Opinion filed September 6, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| SHARON HEATH and TIM HEATH | ) | Appeal from the Circuit Court |
|---|---|---|
| | ) | of the 18th Judicial Circuit, |
| Plaintiffs-Appellants, | ) | Du Page County, Illinois, |
| | ) | |
| | ) | |
| v. | ) | Appeal No. 3-23-0663 |
| | ) | Circuit No. 21-L-390 |
| THE CITY OF NAPERVILLE, MARCUS | ) | |
| BISHEL, and SUSAN BISHEL, | ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Timothy J. McJoynt, |
| (The City of Naperville, Defendant-Appellee). | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justices Brennan and Peterson concurred in the judgment and opinion.

_____

**OPINION**

¶ 1     In April 2021, plaintiffs—Sharon Heath (Sharon) and Tim Heath (Tim)—sued

defendants—the City of Naperville (City), Marcus Bishel, and Susan Bishel—after Sharon tripped

and fell on an uneven sidewalk in front of the Bishels' home in Naperville. The City moved for

summary judgment. Relying on section 3-102 of the Local Governmental and Governmental

Employees Tort Immunity Act (Act) (745 ILCS 10/3-102 (West 2020)), the City asserted (1) the

Heaths had not established the City's actual or constructive notice of the sidewalk's condition (*id.*

§ 3-102(a)) and (2) the City did not discover the sidewalk's condition though it maintained and operated with due care a reasonably adequate inspection system (*id.* § 3-102(b)). The circuit court found the Heaths failed to establish the City had notice of the uneven sidewalk and, accordingly, entered judgment in the City's favor.

¶ 2 The Heaths appeal, and we reverse and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4 On May 24, 2020, Sharon left her home at around 10 a.m. to go for a walk. A short distance from her home, she tripped over a height differential between uneven sidewalk sections (defect) in front of the Bishels' home on Villanova Drive. Sharon fell to the ground, fracturing her left wrist and bruising and scraping her right knee and elbow. About a week later, she underwent surgery to repair her fractured wrist.

¶ 5                               A. Plaintiffs' Complaint

¶ 6 In April 2021, the Heaths sued the City and the Bishels. (The Bishels are no longer parties to this action.) The Heaths alleged the City violated its duty to maintain the sidewalk in a reasonably safe condition by (1) failing "to properly maintain the sidewalk so that it became loose, uneven[,] and broken"; (2) failing "to mark or warn of the loose[,] uneven[,] and broken sidewalk"; and (3) failing "to have a proper inspection system to notify [the City] its property was in an unreasonably unsafe condition." They asserted the City knew or should have known of the sidewalk's unsafe condition. Sharon sought money damages for her injuries. Tim sought money damages for loss of consortium and the medical bills for which he was responsible under section 15 of the Rights of Married Persons Act (750 ILCS 65/15 (West 2020)).

¶ 7                    B. The City's Answer and Affirmative Defenses

¶ 8        The City answered the complaint and asserted two affirmative defenses. Relevant here, the City asserted it was immune from suit under section 3-102(b) of the Act (745 ILCS 10/3-102(b) (West 2020)) because it maintained and operated with due care a reasonably adequate inspection system for its sidewalks but did not discover the defect.

¶ 9                                    C. Discovery

¶ 10       During discovery, the parties deposed several witnesses: (1) Sharon; (2) Tim; (3) Sharon and Tim's son, Liam Heath; (4) Susan Bishel; (5) Chris Nichols, a project engineer in the City's Transportation, Engineering, and Development (TED) department; (6) Marcus Marino, an inspector in the City's TED department; (7) Yifang Lu, a former project engineer and current deputy city engineer; (8) Sandy Scarim, the City's forestry department field supervisor; and (9) Fred Girard, the City's public works operations supervisor. The depositions established the following.

¶ 11                       1. *The City's Maintenance Programs*

¶ 12       The City has approximately 900 miles of sidewalk within its boundaries. The City operates programs that involve sidewalk inspections. However, only one of those programs—the sidewalk repair and replacement program—is dedicated to recognizing and repairing or replacing unsafe conditions on City sidewalks. Under this program, the City adopted a policy in which it repairs or replaces sidewalk sections when any one of the following conditions is present: (1) a height differential of at least one inch between adjacent sections, (2) a breakage within a section, causing it to split into three or more pieces, or (3) deterioration (such as by spalling) of at least half of a section's surface.

3

¶ 13                    a. The Sidewalk Repair and Replacement Program

¶ 14        The sidewalk repair and replacement program is "not systematic." It does not consist of inspectors walking along the City's sidewalks on set intervals, looking for unsafe conditions. Rather, the program is driven by requests and complaints from the public. The City advertises the program on its website, on its social media accounts (including its Facebook page), and possibly on flyers mailed with utility bills. The City receives many requests and complaints each year, both by telephone and electronic communication.

¶ 15        When the City receives a request or complaint, an inspector visually inspects the sidewalk to determine whether it meets the City's repair and replacement criteria. Generally, the inspector measures a height differential if it appears close to an inch or more. And if the inspection is made pursuant to a trip-and-fall report, the inspector measures all height differentials in the relevant area. If the measurement confirms the sidewalk meets the height-differential criterion, the inspector marks the sidewalk section or sections so the City's public works department can place a temporary asphalt ramp to eliminate the differential. The inspector also marks the sidewalk for replacement in the following annual replacement cycle.

¶ 16        The program's reliance on requests and complaints makes it "very efficient," as it would otherwise be impossible for the City's five TED inspectors to check all 900 miles each year or every few years. The TED inspectors each spend 20% or more of their time inspecting sidewalks. Together, they inspect "thousands" of feet of sidewalks each year.

¶ 17                         b. Road Resurfacing Programs

¶ 18        The City operates three road-resurfacing programs that involve sidewalk inspections: the microresurfacing program, the motor-fuel-tax-funded resurfacing program, and the city-funded resurfacing program. Under the microresurfacing program, the City lays a thin layer of asphalt

4

over existing roadways. As part of the process, the City inspects the sidewalks at *street corners* to ensure the sidewalk-to-street connections are "up to current compliance and code" and do not meet the City's sidewalk repair and replacement criteria.

¶ 19 Under the motor-fuel-tax-funded and city-funded programs (which we will refer to collectively as the macroresurfacing program[1]), a road is resurfaced once it reaches the end of its "life cycle," approximately every 15 to 20 years. Each year, the City selects which roads will be resurfaced in the following year. Before resurfacing begins, a TED inspector inspects the sidewalks and curbs adjacent to the roadway, looking for the presence of the repair and replacement criteria. The inspector marks the sidewalk for replacement if an area meets one of the criteria.

¶ 20 The City also operates a roadway patching and crack-filling program. Under this program, City employees drive along City roads looking for potholes and cracks that need repair. The program does not include sidewalk inspections.

¶ 21 c. Tree-Trimming and Brush- and Leaf-Pickup Programs

¶ 22 The City also operates the parkway tree-trimming program and the brush- and leaf-pickup programs. These programs involve employees or contractors working near City sidewalks. Under the parkway tree-trimming program, the trees along each street are trimmed on a seven-year cycle. The City implemented its first seven-year cycle in 2017 or 2018. Independent of the seven-year cycle, the City inspects and trims parkway trees upon request. Scarim—the Forestry department field supervisor—was not informed of the City's sidewalk repair and replacement criteria or otherwise trained to recognize unreasonably dangerous sidewalk conditions. Both forestry department employees and contractors trim parkway trees. Neither is directed to report dangerous

---

[1]The programs appear to have no difference other than their funding sources.

5

sidewalk conditions. However, Scarim has made such reports to the TED department and received such reports from his employees.

¶ 23    The City operates brush- and leaf-pickup programs in the spring and fall, respectively. The brush-pickup program runs for five weeks, and City contractors pick up brush at each house once. The contractors use grapple trucks to collect brush that residents put by the curb. (The record does not indicate anyone stands outside the grapple truck to assist with brush pickup.)

¶ 24    The leaf-pickup program runs for six weeks, and City employees and contractors pick up leaves that residents put in the street. Each house is picked up three times in the six weeks. Some of the pickup crews employ "rakers," who walk along the curb and remove rocks and sticks from the leaf piles before they are picked up by machinery. Some crews also use front-end loaders, which push leaves away from the curb to be picked up by other machinery. Since 2018 or 2019, however, leaf piles on Villanova Drive have been picked up by a contractor who uses a leaf vacuum unit, which does not require rakers and does not involve anyone walking the street.

¶ 25    2. *Sharon Trips and Falls on the Sidewalk in Front of the Bishels' Home*

¶ 26    The Bishels purchased their home in May 2019. Susan primarily mowed the lawn and also shoveled snow off the sidewalk. Susan acknowledged the defect at issue. However, she could not recall the first time she noticed it. Susan never measured the defect. She described it as a "very slight raise in the sidewalk squares." According to Susan, "[i]t was nothing out of the ordinary for our neighborhood" and "wasn't anything [she] was concerned about tripping over or being a problem." Susan, her family, and her son's friends often walked or rode bikes over the defect. To Susan's knowledge, no one had tripped on the defect or had trouble traversing it.

¶ 27    Plaintiffs lived on Vassar Drive for more than 26 years before Sharon's fall. Sharon often walked in the neighborhood. About a decade before Sharon's fall, the Heaths reported a sidewalk

6

defect in front of their house. The City repaired the defect after plaintiffs reported it. After Sharon's fall, Tim saw a "large number" of similar sidewalk defects around the neighborhood.

¶ 28    On May 24, 2020, Sharon left her home at around 10 a.m. to go walking. She walked north on Vassar Drive, turned right onto Lisson Drive, and turned left onto Villanova Drive. As she approached the Bishels' home, Sharon tripped on the defect and "stagger[ed] for a couple steps" before falling to the ground. According to Sharon, no physical objects blocked her view of the defect; however, trees on both sides cast "a very dark shadow" over it.

¶ 29    Sharon was "sure" she had taken that route before. When asked whether she had "any knowledge that the City *** had actual notice that this deviation existed on the date of [her] injury," Sharon answered, "I know that it has been there a very long time, based on Google Maps." Sharon believed the defect had been present for at least two years.

¶ 30    Sharon called Tim after her fall, and he drove to the scene. When Tim arrived, Sharon pointed him to where she had tripped. According to Tim, the defect would have been "blatantly apparent" to the homeowners any time one of them mowed the lawn or shoveled snow off the sidewalk. Tim did not know whether anyone else had tripped on the defect. Tim and Sharon had walked over the defect in the past with no issues. Tim did not notify the homeowners of the defect at any time because he did not believe he had an obligation to do so. Nor did Tim notify the City.

¶ 31    During his deposition, Tim was asked whether he had "any knowledge that the City *** ha[d] actual notice that th[e] deviation existed on May 24, 2020." Tim answered, "I know that the defect has been there since 2012 based on the Google photographs." Further, Tim testified the City has an ordinance that requires its personnel to look for potential defects in the sidewalks and that he had seen the City's personnel driving by, looking for residents violating the City's watering ordinance. Based on those observations, Tim continued, he could not "believe *** [the City was]

7

not aware of it from [its] employees." In addition, Tim said the City had "made other corrections on parts of the sidewalk near" the Bishels' home, which meant the City "would have had to have been in the area in order to make those corrections."

¶ 32    Shortly after Sharon's fall, Sharon and Tim returned to the scene and photographed the defect. Tim returned again in August 2020, and at that time, the defect was greater than two inches.

¶ 33    At the time of Sharon's fall, the Heaths' son, Liam Heath, was a college senior out of state and was home on summer break. Plaintiffs notified Liam of Sharon's fall later that evening. As soon as his parents described the sidewalk where Sharon tripped, Liam "knew the location that they were speaking of." He had lived in that area his entire life and Villanova Drive "happen[ed] to be on a route that [he] took quite often to get to [his] elementary school and a couple of [his] friends' houses." During his deposition, Liam said he was familiar with the sidewalk section at issue, and the following exchange occurred:

"Q. And prior to that May 24th date, what would your familiarity or your memory have been of that sidewalk specifically?

A. I—I remember biking over that road specifically—that sidewalk specifically, and I remember avoiding that sidewalk.

Q. And when you say you remember avoiding that sidewalk, are you referring generally to the sidewalk that runs along Villanova or specifically—

A. That's correct.

Q. Okay. So you in general would avoid that side of the sidewalk?

A. That's correct.

Q. And what was the reason you would avoid that side of the sidewalk?

A. That side of the sidewalk was not well maintained.

8

\* \* \*

Q. Had you ever known of anyone else to trip and fall [at the] location on Villanova [at issue?]

A. I have not."

¶ 34 In February 2021, Marino—a City TED inspector—inspected the sidewalk in front of the Bishels' home and observed the defect. Based on his 18 years of experience, he believed the defect was caused by the roots of an adjacent, mature parkway tree. He marked the section for replacement and for placement of a temporary asphalt ramp. He also marked the section "R/P," or "root pruning." Marino did not measure the defect in his initial inspection. Marino later returned to the scene, however, and measured the defect at more than 2 inches but a little less than 2½ inches. The City has since repaired that area of sidewalk.

¶ 35 3. *Google Street View Images*

¶ 36 The Heaths obtained Google Street View images of Villanova Drive in the vicinity of the Bishels' home.[2] One image was captured by Google in September 2012, and the other was captured in September 2018. The 2012 image depicts the defect. The 2018 image also depicts the defect, which appears larger than it was in 2012. Neither image contains a measurement of the defect.

¶ 37 4. *Previous Reports, Inspections, and Maintenance Near the Bishels' Home*

¶ 38 According to the City's records, the City had not received any requests or complaints concerning the condition of the sidewalk in front of the Bishels' home from 2002 until the date of Sharon's fall. Villanova Drive was last resurfaced in 2009, and the City inspected the sidewalk in front of the Bishels' home at that time. That inspection was the only inspection of the sidewalk in

---

[2]The City initially objected (lack of foundation) but no longer challenges the images' admissibility.

9

front of the Bishels' home. The parkway trees on Villanova Drive were last trimmed in 2021. Scarim did not know the last time they were trimmed before 2021. A comparison of the 2012 and 2018 Google Street View image shows the City filled cracks in the roadway in front of the Bishels' home sometime after 2012.

¶ 39                    D. The City's Motion for Summary Judgment

¶ 40        The City moved for summary judgment, contending plaintiffs had not come forward with any evidence showing the City had either actual or constructive notice of the unsafe condition at issue. 745 ILCS 10/3-102(a) (West 2020). In addition, the City argued it had established it did not discover the unsafe condition, despite having maintained and operated with due care a reasonably adequate inspection system. *Id.* § 3-102(b).

¶ 41                    E. Plaintiffs' Response—Liam's Affidavit

¶ 42        Plaintiffs attached to their response an affidavit from Liam, which was later "revised."[3] In his revised affidavit, Liam averred that he lived with his parents his entire life until he went to college in the fall of 2016 and continued to live with his parents when home on breaks from college until January 2021. When Liam lived with his parents, he often went by the area where Sharon fell, "either walking, on [his] bicycle[,] or by car *** since it was on [his] way to [his elementary school], amongst other reasons." Thus, he had seen the area numerous times, whether on foot, on his bike, or while driving. Liam further averred he had reviewed the 2012 Google Street View image. It truly and accurately depicted the defect as he remembered it in 2012. According to Liam, "Even at that time, hitting the uneven sidewalk with the front tire of [his] bicycle was sufficient

_____

[3]The City moved to strike Liam's original affidavit, arguing it contained statements that contradicted Liam's deposition testimony and also contained conclusory assertions that were not supported by his testimony. The circuit court granted the City's motion to strike because Liam's affidavit was neither dated nor notarized.

10

for [him] to be concerned about the discrepancy in the heights of the sidewalk slabs." At the time, he estimated, the defect was greater than one inch. Further, Liam reviewed the 2018 Google Street View image. It likewise truly and accurately depicted the sidewalk as he remembered it "both not long before and not long after September 2018." According to Liam, the defect had increased "to likely [two] inches or more." Liam recalled seeing debris collecting in that spot due to the height discrepancy between the slabs. Finally, Liam reviewed the 2020 photographs, taken by his parents. Those photographs truly and accurately depicted the sidewalk as he remembered it, "both not long before and not long after May 24, 2020." The defect at that time was "[two] inches or more." The photographs also accurately depicted "the dappling effect that occurred with the shade from the trees in the mornings of the spring and summer, which [made] the discrepancy *** difficult to detect."

¶ 43                               F. The Circuit Court's Ruling

¶ 44        The circuit court granted the City's motion. The court concluded there was no evidence the City had actual notice. Further, it determined there was no triable question on the issue of constructive notice, reasoning the record lacked "competent evidence to show how long and how large this alleged defect existed." The court found Liam's affidavit "was chock-full of conjecture and opinion." The court explained that given these conclusions, it did not need to address the City's defense, under section 3-102(b), that the City maintained and operated with due care a reasonably adequate inspection system.

¶ 45        This appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47        On appeal, the Heaths contend the circuit court erred when it granted the City's motion for summary judgment. Specifically, the Heaths argue the record presents triable questions as to

11

whether the City had actual or constructive notice of the defect. Further, they assert the record presents a triable question as to whether the City maintained and operated with due care a reasonably adequate inspection system.

¶ 48                                    A. Standard of Review

¶ 49        Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Summary judgment is a drastic means of disposing of litigation and should be granted only if the moving party's right to judgment is clear and free from doubt. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 50        The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a triable issue exists. *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 396 (2008). "A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Id.* at 395. In deciding the motion, the circuit court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant. *Id.* The court must not weigh the evidence or assess credibility. *Id.* at 396. However, the nonmoving party must present some evidence that would arguably warrant relief and may not rely on speculation or conjecture to avoid summary judgment. *Kasper v. McGill Management Inc.*, 2019 IL App (1st) 181204, ¶¶ 22-23. We review *de novo* the grant of summary judgment. *Pielet v. Pielet*, 2012 IL 112064, ¶ 30.

¶ 51                                   B. Section 3-102(a) of the Act

12

¶ 52        Section 3-102(a) of the Act states a municipality must maintain its property in a reasonably safe condition. 745 ILCS 10/3-102(a) (West 2020). However, a municipality is not liable for an injury unless the plaintiff proves the municipality had "actual or constructive notice of the existence of a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." *Id.*; see *Ory v. City of Naperville*, 2023 IL App (3d) 220105, ¶ 24. Generally, the question of notice is one of fact. *Ory*, 2023 IL App (3d) 220105, ¶ 24. But the question becomes one of law when all the evidence, viewed in the light most favorable to the plaintiff, "so overwhelmingly favors the defendant *** that no contrary verdict could ever stand." *Id.* Accordingly, "[t]o survive summary judgment, the plaintiff needs to provide evidence sufficient to support a jury finding that the city had either actual or constructive notice of the defect that caused her fall in adequate time to have taken measures to repair the sidewalk." *Id.* ¶ 25.

¶ 53        1. *There Is No Genuine Issue of Material Fact that the City Did Not Have Actual Notice*

¶ 54        We turn first to actual notice. "[A]ctual notice means notice of the condition only, not the unsafe nature of the condition." (Internal quotation marks omitted.) *Id.* ¶ 26. A plaintiff can establish actual notice either by showing (1) a municipal employee had actual knowledge of the defect in question or (2) the municipality received a prior report of the defect. *Id.*

¶ 55        The Heaths do not dispute the City never received a prior report of the defect. Rather, they argue the record contains circumstantial evidence from which the factfinder could infer a City employee or contractor, and thus the City, had actual knowledge of the defect. Specifically, the Heaths note that City employees and contractors were frequently in the vicinity of the Bishels' home from 2009 to 2020. They also assert, per section 9-1A-7 of the Naperville Municipal Code (Naperville Municipal Code § 9-1A-7 (adopted Apr. 3, 2018)), City employees and contractors

13

were obligated to be trained to recognize and report unsafe sidewalk conditions. The Heaths maintain that, given the defect's conspicuity and section 9-1A-7, the employees and contractors must have seen the defect. Thus, the employees and contractors had actual knowledge, which can be imputed to the City. We reject the Heaths' position.

¶ 56     Initially, we must scale back the factual premise—that the defect was so conspicuous it must have been observed by City employees or contractors any time they were in the area—on which the Heaths base their argument. The record does not establish, at this point, whether the defect was conspicuous. Admittedly, the defect being more than two inches supports the Heaths' assertion. See *Ramirez v. City of Chicago*, 318 Ill. App. 3d 18, 25 (2000). Yet the record reveals a factual dispute as to whether the defect could be easily seen notwithstanding its height. The Heaths themselves testified it was difficult to see the defect due to the adjacent parkway tree that sometimes cast a "very dark" shadow or had a "dappling effect" on the sidewalk.

¶ 57     Second, we must clarify what section 9-1A-7 of the Naperville Municipal Code requires. Section 9-1A-7 of the Naperville Municipal Code states, in part, as follows:

> "The City's sidewalk and roadway project inspectors and engineers shall be trained to recognize unreasonably dangerous conditions in public sidewalks along the public path of pedestrian travel. It shall be the duty of every field operations employee becoming cognizant of any unreasonably dangerous condition in any path of public pedestrian travel or any obstruction thereof, to report the same to City dispatch as soon as possible." Naperville Municipal Code § 9-1A-7 (adopted Apr. 3, 2018).

¶ 58     Contrary to the Heaths' assertion, section 9-1A-7 does not require all Naperville employees or contractors to be trained to recognize unreasonably dangerous conditions on public sidewalks. Rather, it unambiguously places that requirement on a specific subset of City employees:

14

"sidewalk and roadway project inspectors and engineers." *Id.*; see *Sullivan v. Village of Glenview*, 2020 IL App (1st) 200142, ¶ 23 (municipal ordinances must be applied as written). Turning to the second sentence, even if "every field operations employee" means something more than the inspectors and engineers referred to in the preceding sentence, the ordinance does not require all City employees to look for unreasonable dangerous conditions on City sidewalks. It merely places on them the duty to report unreasonably dangerous conditions that they observe.

¶ 59        With this understanding of section 9-1A-7, we turn to the circumstantial evidence cited by the Heaths, which we conclude does not establish a triable question as to the City's actual notice. To be sure, actual notice may be established by circumstantial evidence. See *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 398 (2000) (any and all elements of a negligence action may be proved by circumstantial evidence). And true, a municipal employee's actual knowledge may be imputed to the municipality. *Glass v. City of Chicago*, 323 Ill. App. 3d 158, 163 (2001), *abrogated on other grounds by Martin v. City of Chicago*, 2023 IL App (1st) 221116, ¶¶ 33-34. But "a fact cannot be established through circumstantial evidence unless the circumstances are so related to each other that it is the only probable, and not merely possible, conclusion that may be drawn." *Keating v. 68th and Paxton, L.L.C.*, 401 Ill. App. 3d 456, 473 (2010). In other words, if "the proven facts demonstrate that the nonexistence of the fact to be inferred appears to be just as probable as its existence, then the conclusion that exists is a matter of speculation, surmise, and conjecture, and *the trier of fact cannot be permitted to make that inference*." (Emphasis added.) *Id.*

¶ 60        The Heaths rely on four pieces of circumstantial evidence: (1) Tim's testimony that he observed City vehicles driving down Vassar Drive looking for watering-ordinance violations; (2) the testimony concerning the City's brush- and leaf-pickup programs; (3) the testimony

15

concerning the parkway tree-trimming program; and (4) the Google Street View images showing Villanova Drive was repaired under the City's roadway patching and crack-filling program.

¶ 61     This evidence establishes nothing more than a possibility that a City employee or contractor may have seen the defect. While Tim recalled seeing City vehicles looking for watering-ordinance violations in front of his house on Vassar Drive, the Heaths presented no evidence placing those employees within viewing distance of the defect. Nor did they elicit evidence showing the Bishels or their predecessors ever placed brush or leaves at the curb for pickup. The evidence established the parkway trees on Villanova Drive were trimmed in 2021, but no evidence was presented showing if or when the trees adjacent to the defect were trimmed before 2021. And while the Google Street View images show roadway cracks were filled on Villanova Drive on some unidentified date or dates between 2012 and 2018, the record contains no evidence as to how that program operated and who was present during the process. Simply put, the Heaths presented no evidence that a City employee trained to look for and recognize unreasonably dangerous sidewalk conditions was near the defect between 2009 (when Villanova Drive was last resurfaced) and 2020. These evidentiary gaps cannot be filled by a speculative conclusion that the City had actual knowledge of the defect. We thus find no error in the circuit court's determination, as a matter of law, that the City did not have actual notice of the defect.

¶ 62     2. *There Is a Genuine Issue of Material Fact that the City Had Constructive Notice*

¶ 63     We turn next to constructive notice. Constructive notice may be established if the condition has existed for such a length of time, or was so conspicuous or plainly visible, that authorities exercising reasonably care might have known of it. *Ory*, 2023 IL App (3d) 220105, ¶ 27.

¶ 64                                a. Length of Time

¶ 65    The Heaths contend the record presents a triable question on constructive notice because the record contains evidence from which the factfinder could conclude the defect was at least (1) one inch, and thus subject to repair or replacement under the City's criteria, since September 2012 and (2) two inches since at least September 2018. To support their argument, the Heaths rely on the Google Street View images, Sharon's and Tim's testimony concerning how long the defect was present, and Liam's affidavit. They also point to Marino's testimony that the defect was caused by the roots of the adjacent parkway tree, which they contend permits an inference that the defect grew slowly over time.

¶ 66    The City responds the Heaths failed to present "credible [and] competent evidence establishing how large the defect was at any given time or when the [defect] exceeded one inch, making it subject to repair or replacement under the City's replacement [criteria]." Specifically, the City argues the Google Street View images do not establish the defect was in an actionable condition in 2012 or 2018 and Liam's affidavit was not credible for various reasons. We agree with the Heaths.

¶ 67    Here, the evidence shows the sidewalk in front of the Bishels' home was last inspected when Villanova Drive was resurfaced in 2009. The 2012 Google Street View image shows the defect was present in September 2012, more than seven years before Sharon tripped on it. Though neither Sharon nor Tim testified concerning the defect's measurement in 2012, Liam's affidavit establishes the defect measured at least one inch at that time and was thus subject to the repair or replacement under the City's criteria. Further, the 2018 Google Street View image, together with Liam's affidavit, establishes the defect had grown about an inch in the intervening six years. When Tim returned to the scene months after Sharon's injury and Marino inspected the sidewalk in 2021,

17

the defect had grown a little more, measuring more than two inches. In addition, the Heaths produced evidence that the defect was caused by the roots of the adjacent parkway tree.

¶ 68 Admittedly, Liam's averments concerning the defect's height in 2012, 2018, and 2020 appear to be estimates, not actual measurements. However, Liam's affidavit establishes his estimates were based on his personal knowledge of the area, from years of having passed it on foot, on a bike, or by car. And it is well settled that a lay witness may offer an estimate, based on his or her observations, of something's size. See, *e.g.*, *People v. Burton*, 6 Ill. App. 3d 879, 886 (1972). In any event, the above-noted evidence produced by the Heaths would permit a reasonable factfinder to conclude the defect was present and subject to repair in 2012 and grew slowly over the next nine years.

¶ 69 The City relies heavily on *Ory* to support its argument. In *Ory*, the plaintiff tripped and fell on a walkway in July 2017. *Ory*, 2023 IL App (3d) 220105, ¶ 5. She sued Naperville and, in response to the city's motion for summary judgment, sought to use Google Earth photographs purportedly taken in 2012, 2013, and 2016, each of which showed the walkway was " 'not flush' " in the area where the plaintiff fell. *Id.* ¶ 12. The circuit court granted the city's motion for summary judgment, in part finding there existed no genuine issue as to the city's constructive notice. On appeal, the plaintiff argued Google Earth photographs established the city's constructive notice, because the photographs showed "a visible gap" on the walkway where the plaintiff tripped. *Id.* ¶ 35. We rejected the plaintiff's position, explaining the plaintiff failed to present "evidence establishing how large the gap was at any given time or when the gap exceeded one inch." *Id.* ¶ 38. Further, the city had presented evidence that the walkway was inspected less than two years before the plaintiff's fall and, at the time, the defect was less than one inch. *Id.* Thus, we concluded the plaintiff had "failed to establish that the sidewalk was in a dangerously defective condition for so

18

long that the [c]ity should have been aware of it," and we affirmed the circuit court's judgment. *Id.*

¶ 70        *Ory* is distinguishable. In *Ory*, the city presented evidence of an inspection, which revealed the defect was less than one inch, that occurred in the subject area just two years before the plaintiff tripped. The presence of a recent, unremarkable inspection in *Ory* undermined the plaintiff's assertion that the defect was present for so long as to give the City constructive notice, particularly given no witness testified as to when the defect exceeded one inch. Here, on the other hand, the City last inspected the sidewalk in front of the Bishels' home when Villanova Drive was resurfaced in 2009.

¶ 71        More importantly, unlike the Google Earth photographs in *Ory*, the Google Street View images presented by the Heaths do not stand alone. In his amended affidavit, Liam stated he had reviewed the images, and based on his personal knowledge of the area in question, they fairly and accurately depicted the defect as it existed both in September 2012, at which time the defect measured an inch or more, and September 2018, at which time the defect measured two inches or more.

¶ 72        The City, however, asserts Liam's affidavit is not credible for three reasons and should therefore be disregarded. First, his testimony "completely changed" in the six months after his deposition in January 2023, where he initially testified he avoided the sidewalk at issue because it was not well maintained but later submitted an affidavit in which he purportedly recalled the defect's height measurements both in 2012 and 2018. Second, the timing of his affidavit was "suspect" because it was presented after *Ory* was decided and provided information to defeat *Ory*'s effect on the Google Street View images. Third, the affidavit "lack[ed] specificity as to how frequently he saw the defect and where he was while seeing the defect."

19

¶ 73    The City's arguments all go to Liam's credibility, which we may not assess at this juncture. See *Coole*, 384 Ill. App. 3d at 396 (courts may not weigh evidence or assess credibility at summary judgment). Indeed, at this stage, we must construe all the evidence in the Heaths' favor. See *id.* at 395. If the factfinder were to accept Liam's affidavit as credible, it might find the defect was present in 2012 and could reasonably conclude the City had constructive notice of the defect based on the duration of its presence.

¶ 74                                      b. Conspicuity

¶ 75    Second, as we have noted, the record presents a genuine question as to whether the defect was conspicuous. A defect is conspicuous when it is plainly visible. *Pinto v. DeMunnick*, 168 Ill. App. 3d 771, 775 (1988). Whether a defect is conspicuous must be decided on a case-by-case basis. *Ramirez*, 318 Ill. App. 3d at 25. Defects that are " '[m]aybe a couple inches in size' " may properly be found conspicuous. *Id.*

¶ 76    The record contains evidence from which the factfinder could conclude the defect was sufficiently conspicuous to charge the City with constructive notice. Notably, the record contains evidence the defect was greater than two inches when Sharon tripped on it and could be seen from a vehicle passing on the street taking images of the area. See *Ramirez*, 318 Ill. App. 3d at 25. Of course, the defect was in a residential area, making it less likely to be discovered than if it were in a busy area, such as the City's downtown. *Cf. Baker v. Granite City*, 75 Ill. App. 3d 157, 161 (1979). And the adjacent parkway tree cast a "very dark shadow" or had a "dappling effect" on the defect, which one witness, Bishel, described as "very slight." Even the Heaths testified the defect was at least sometimes difficult to see.

¶ 77    Simply put, there exists a triable question as to whether the defect was present for so long or was so conspicuous as to charge the City with constructive notice. The record contains evidence

20

showing the defect (1) was at least one inch in September 2012, (2) was at least two inches in September 2018 (almost two years before Sharon tripped), and (3) was conspicuous. If accepted, this evidence is sufficient to charge the City with constructive notice of the defect. Accordingly, we conclude the circuit court erred when it found the Heaths did not present evidence that warranted submitting the issue to the factfinder.

¶ 78                                    C. Section 3-102(b) of the Act

¶ 79          We turn next to the City's contention that it produced evidence establishing, as a matter of law, that it lacked constructive notice because it maintained a reasonably adequate inspection system under section 3-102(b) of the Act. We may address this question even though the circuit court did not rely on this basis when ruling in the City's favor. See *Baumgartner v. Greene County State's Attorney's Office*, 2016 IL App (4th) 150035, ¶ 41 (appellee may urge the appellate court to affirm on any basis supported by the record).

¶ 80          1. *A Reasonably Adequate Inspection System May Prove a Lack of Constructive Notice*

¶ 81          Section 3-102(b) states a public entity may establish its lack of constructive notice if the public entity proves

>      "(1) The existence of the condition and its character of not being reasonably safe would not have been discovered by an inspection system that was reasonably adequate considering the practicability and cost of inspection weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise to inform the public entity whether the property was safe for the use or uses for which the public entity used or intended others to use the public property and for uses that the public entity actually knew others were making of the public property or adjacent property; or

21

(2) The public entity maintained and operated such an inspection system with due care and did not discover the condition." 745 ILCS 10/3-102(b) (West 2020).

¶ 82    The City argues that it lacked constructive notice as a matter of law because it maintained and operated an inspection system with due care that was reasonably adequate considering the practicability and cost of inspection, weighed against the likelihood and magnitude of the potential danger to which failure to inspect would give rise.

¶ 83    Section 3-102(b) places the burden of proof as to the reasonableness of an inspection system on the governmental entity. *Id.* Whether the City maintains and operates a reasonably adequate inspection system, thus proving a lack of constructive notice, is generally a question of fact. See *Baker v. Granite City*, 311 Ill. App. 586, 593 (1941); see also *C.D.L., Inc. v. East Dundee Fire Protection District*, 252 Ill. App. 3d 835, 846 (1993); *T.S. v. Joliet Public Schools District 86*, 2021 IL App (3d) 190076-U, ¶ 54.

¶ 84    2. *There Is a Genuine Issue of Material Fact that the City Maintained and Operated with Due Care a Reasonably Adequate Inspection System*

¶ 85    The City contends it established that it maintains and operates with due care a reasonably adequate inspections system "because *** there are processes in place for the who, what, where, when and how sidewalks will be inspected and replaced." Specifically, it identifies two municipal programs that, taken together, constitute a reasonably adequate inspection system, especially considering the large amount of sidewalk within its boundaries.

¶ 86    We conclude the record presents a triable question as to whether the City's purported inspection system was reasonably adequate under the circumstances. The City maintains one program—sidewalk repair and replacement program—that is dedicated to discovering and remedying unreasonably dangerous sidewalk conditions. The program relies primarily on requests

22

and complaints from the public, and it receives many requests and complaints each year. When a report is received, one of the City's TED inspectors visually inspects the sidewalk and determines whether further investigation, and ultimately repair or replacement, is warranted. If the City determines the sidewalk meets its replacement criteria, it takes quick action to temporarily and then permanently repair the dangerous condition. The program is advertised on the City's website, Facebook page, and (possibly) in conjunction with utility bills.

¶ 87     But by the admission of Nichols, the City engineer who leads the program, the sidewalk repair and replacement program is "not systematic." Indeed, the program does not involve TED inspectors walking along the sidewalks and looking for dangerous conditions on set intervals. While the City employs five inspectors, each of whom devote at least 20% of their time to sidewalk inspections, the City's TED inspectors only inspect "thousands" of feet of sidewalk per year.

¶ 88     The City also maintains and operates road-resurfacing programs. The microresurfacing program does not involve sidewalk inspections; rather, the inspections are focused on the sidewalk-to-street connections at street corners. The macroresurfacing program, however, involves sidewalk inspections that can fairly be characterized as systematic. Under the program, the City's TED inspectors visually inspect the sidewalks adjacent to roadways scheduled for replacement. However, roads in the City are resurfaced only once every 15 to 20 years, meaning many areas may go 15 to 20 years without an inspection.

¶ 89     As noted, whether a municipality maintains and operates a reasonably adequate inspection system, thus proving a lack of constructive notice, is generally a question of fact. See *Baker*, 311 Ill. App. at 593; 745 ILCS 10/3-102(b) (West 2020). The City's inspection system for 900 miles of sidewalk involves five inspectors who rely on citizen complaints and street resurfacing that occurs every 15 to 20 years to identify potentially dangerous conditions. We cannot conclude, as

23

a matter of law, that this system is reasonably adequate under the circumstances and leave this question to the finder of fact.

¶ 90                                    III. CONCLUSION

¶ 91        For the reasons stated, we reverse the judgment of the circuit court of Du Page County and remand for further proceedings.

¶ 92        Reversed and remanded.

*Heath v. City of Naperville*, 2024 IL App (3d) 230663

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 21-L-390; the Hon. Timothy J. McJoynt, Judge, presiding. |
| **Attorneys for Appellant:** | R. Mark Maritote, of Hanover Park, and Timothy W. Heath, of Heath & Heath, P.C., of Naperville, for appellants. |
| **Attorneys for Appellee:** | Kristen Toberman, of City of Naperville, of Naperville, for appellee. |