**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240358-U

Order filed August 4, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| PEKIN INSURANCE COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| MICHELLE RYDZEWSKI, as the Administratrix | ) | |
| of the Estate of ELECTRA ROUMELIOTIS, | ) | |
| Deceased, and BENJAMIN GRAUNKE, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| (Benjamin Graunke, Defendant-Appellant). | ) | |
| _____ | ) | |
| | ) | Appeal No. 3-24-0358 |
| PROGRESSIVE NORTHERN INSURANCE | ) | Circuit No. 21-MR-1861 |
| COMPANY, | ) | |
| | ) | |
| Intervenor-Counter-Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHELLE RYDZEWSKI, as the Administratrix | ) | |
| of the Estate of ELECTRA ROUMELIOTIS, | ) | |
| Deceased, and BENJAMIN GRAUNKE, | ) | |
| | ) | |
| Counter-Defendants, | ) | |
| | ) | Honorable |
| (Benjamin Graunke, Counter-Defendant- | ) | John C. Anderson, |
| Appellant). | ) | Judge, Presiding. |

---

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Holdridge and Bertani concurred in the judgment.

---

**ORDER**

¶ 1    *Held*:   The circuit court erred in granting summary judgment to auto insurance companies. Genuine issues of material fact existed as to (1) whether at-fault driver's vehicle use was permissive and (2) whether the driver was a resident relative under her stepfather's insurance policy. Reversed and remanded.

¶ 2    A single-vehicle rollover accident resulted in the driver's death and injuries to the passenger, Benjamin Graunke, who later obtained a money judgment against the driver's estate. Plaintiff, Pekin Insurance Company (Pekin), and intervenor, Progressive Northern Insurance Company (Progressive) sued the driver's estate and Graunke (defendants), seeking a declaratory judgment that the estate was not entitled to coverage. The circuit court entered summary judgment in favor of Pekin and Progressive, finding the driver was a nonpermissive user of the vehicle. Because genuine issues of material fact exist, we reverse and remand the cause for further proceedings.

¶ 3                    I. BACKGROUND

¶ 4    On July 18, 2017, Electra Roumeliotis died after she lost control of a sports vehicle leased to Mito's Euro Design, Inc. (MED). Electra's sole passenger, Graunke, survived the accident. Milos Sopko, MED's owner, had delivered the vehicle to the home of Electra's mother, Michelle Rydzewski (Michelle), hours before the accident. MED's vehicles were insured under a Pekin-issued policy; and Electra's name was included in a policy Progressive had issued to her stepfather, Lawrence Rydzewski (Lawrence).

¶ 5                   A. Underlying Action

2

¶ 6        In April 2018, Graunke sued (1) Michelle, as the administrator of Electra's estate (Estate), and (2) MED. Graunke alleged Electra negligently injured him, both in her individual capacity and as MED's agent. In particular, he alleged Electra drove off the roadway at an excessive speed and struck a fire hydrant, causing the vehicle to roll over and injure him. He further alleged MED negligently entrusted the vehicle to Electra when it knew or should have known that she was intoxicated and incompetent to drive the vehicle. Both Pekin and Progressive defended the Estate under a reservation of rights.

¶ 7        The trial court granted summary judgment in favor of MED, and the case proceeded to a trial against the Estate. In January 2023, Graunke was awarded a $330,118.57 judgment against the Estate.

¶ 8                                B. Current Action

¶ 9                                1. Pekin's Complaint

¶ 10        In July 2021, Pekin filed a declaratory judgment action against Graunke and the Estate, alleging it owed no duty to defend the Estate under MED's business auto insurance policy.

¶ 11        The policy's liability section states that Pekin "will pay all sums the insured legally must pay as damages because of bodily injury *** caused by an accident and resulting from the *** use of a covered auto." The policy's omnibus provision expands the definition of "insured" to include anyone using a covered auto with the named insured's permission (with exceptions that do not apply here).

¶ 12        Pekin does not dispute that the vehicle involved in the accident, a Lexus RC F, was a "covered auto." It alleges, however, that Electra was not an insured under the policy, because MED's owner, Sopko, never permitted her to use the Lexus.

¶ 13                                2. Progressive's Crossclaim

3

¶ 14    In March 2023, the circuit court allowed Progressive to intervene. See 735 ILCS 5/2-408 (West 2022). Progressive filed a crossclaim for declaratory judgment against Graunke and the Estate, alleging it owed no coverage under Lawrence's auto insurance policy.

¶ 15    The policy generally requires Progressive to "pay damages for bodily injury *** for which an insured person becomes legally responsible because of an accident." Its definition of "insured person" includes a "relative" involved in an automobile accident. A "relative," in turn, is defined as a person (1) "related to you by blood, marriage or adoption," including a stepchild, and (2) "residing in the same household as you"; if temporarily away from home, unmarried dependent children "qualify as a relative if they intend to continue to reside in your household." The policy defines "you" and "your" as the named insured, and includes the named insured's spouse "if residing in the same household at the time of the loss."

¶ 16    The insuring agreement provides, "Your policy consists of the policy contract, your insurance application, the declarations page, and all endorsements to this policy." The declarations page designates Lawrence as the named insured; it lists Lawrence, Michelle, and Electra as "drivers and resident relatives"; it lists a Range Rover and a BMW 230 as covered autos; and it notes that a premium discount was applied due to Electra's status as a distant student. The policy was renewed on May 31, 2017, and indicates Michelle requested on that date a change in coverage on the Range Rover, and to swap out a Kia Soul for a BMW 230.

¶ 17    Initially, the crossclaim provided only one basis for excluding coverage—that Electra was a nonpermissive driver of a noncovered vehicle. The policy expressly excludes coverage for bodily injury arising out of the use of a noncovered vehicle without the permission of "the owner of the vehicle or the person in lawful possession of the vehicle." Progressive later amended its crossclaim

4

to add a second basis—that Electra was not a resident relative under the policy because she did not reside with either parent, particularly Lawrence, for several months before the accident.

¶ 18                                              3. Motions for Summary Judgment

¶ 19          In August 2023, Pekin and Progressive moved separately for summary judgment (735 ILCS 5/2-1005 (West 2022)). Pekin argued it owed no coverage to the Estate because the undisputed facts showed Sopko did not permit Electra to drive the Lexus. Progressive argued it owed no coverage because Electra was not a permissive user and was not a resident relative of Lawrence at the time of the accident.

¶ 20          Pekin's motion attached the deposition transcripts of Michelle, Sopko, Jacqueline Milton, Graunke, Athena Roumeliotis (Athena), and Chris Allen. Progressive's motion attached the deposition transcripts of Michelle and Sopko. Only Athena and Allen were deposed in the current action; the remaining were deposed in the underlying action. The deponents testified as follows.

¶ 21                                                    a. Michelle Rydzewski

¶ 22          Michelle is Electra's and Athena's mother. On Milton's recommendation, she contacted Sopko's company, MED, for remodeling work at her new home. MED started work in early June 2017. She also began dating Sopko sometime in June 2017.

¶ 23          On July 17, 2017, Michelle hosted dinner at her home. In attendance were Sopko, Milton, Electra, Graunke, Athena, and Athena's boyfriend. At dinner, Athena and Electra argued over who would drive the Range Rover, the only car available to them at the house. One of the sisters had to go to class the next day and the other had work. Athena's car was at college; and only two cars, an Audi R8 and a Range Rover, were at the house. The Audi R8 was Michelle's car, and she forbade her children from driving it. Additionally, her children were not allowed to drive Lawrence's

Maserati. The Maserati was not at the house, however, because Michelle was in the process of divorcing Lawrence at the time.

¶ 24    Sopko said he had an extra car and offered it because "we were short of a car." On hearing Sopko's offer, Athena told him she did not want or need the car. Electra did not say anything, however, so Sopko decided to bring the car. Sopko went home and returned with the Lexus. He left its keys on the kitchen island, and Michelle parked the Lexus in the garage. Sopko never said Electra could not use the car.

¶ 25    After dinner, Electra and her friends took the Range Rover to go bowling. Michelle instructed her to return the car early. Michelle explained, "She had to go home. She works in the city." At the time of the accident, "Electra had her own place, her own apartment." She had moved out of Michelle's home in December 2016 and was living in Chicago with a roommate.

¶ 26    Michelle drove Sopko to his house and stayed there awhile, along with Milton. When she returned home later that evening, the Range Rover was back and the Lexus was gone. Michelle was not concerned, however, "because the car was left for them to use." Sopko did not place a limitation on what the vehicle could be used for "because we knew we were going to be out a vehicle for a while."

¶ 27                                    b. Milos Sopko

¶ 28    Sopko owns MED, an interior design and construction company. Michelle was initially an MED client but soon became Sopko's friend. Sopko did not date her, however; the relationship was platonic. Although he still considers himself Michelle's friend, he no longer spends time with her. After the accident, Michelle "got back together with her ex-husband, and they are trying to straighten out their life."

¶ 29        On the eve of the accident, Sopko went to Michelle's home for dinner and brought his company-leased Lexus for Athena to use. Michelle had previously mentioned that Athena needed a car to get around, and he offered to help. He believed Athena only needed a car for the weekend, because she was returning to school. He left the keys in a cupholder and told Athena where he left them. Athena later told him she picked up the keys and placed them somewhere in the house.

¶ 30        Sopko did not tell Michelle that Electra could not use the Lexus. He may have mentioned at dinner that Electra was not allowed to drive the Lexus, but he is not "100 percent certain." After dinner, as he was leaving through the garage, he was met by Electra and Graunke admiring the Lexus and asking questions about its top speed. In that moment, he specifically told Electra she could not touch the Lexus. Milton was also present and would have heard the comment directed at Electra. Sopko did not think Electra was a "very good driver" and noted that, at the time of the accident, Electra's car was getting fixed because she had wrecked it.

¶ 31                                  c. Jacqueline Milton

¶ 32        Milton was a friend to both Michelle and Sopko, but she had known Sopko longer. On July 17, 2017, Michelle hosted a dinner at her new home "as a thank you to us for helping her, you know, with family and friends there." Michelle was separated from Lawrence at the time but has since reconciled with him.

¶ 33        Sopko did not say Electra could not use the Lexus, but he did say it was for Athena. When Athena heard the Lexus was a nice car, Athena said, "[M]aybe I don't want to drive that then." Sopko responded, "You're a good driver; you should be okay." Sopko walked to the garage to show them the Lexus. Milton could not recall who accompanied Sopko to the garage. Later, either Sopko or Michelle said they placed the keys in "a pot or jar or something."

7

¶ 34   Milton was asked if she recalled why Sopko had brought over the Lexus. She testified, "[H]e was bringing it to be used because—I can't remember. I think it was Athena's car needed repair or was broken down and everyone else was using their cars so I believe that's why he brought it over."

¶ 35   Milton was also asked whether Sopko brought the Lexus for just one of the sisters or generally for the family to use. She testified, "[I]f he says you could drive his car, anyone could drive his car. He's that kind of person. But I believe he was bringing it for Athena at the time because she didn't have her car available and all the others were taken up." Milton was unsure whether Athena was a student or working at the time.

¶ 36   Electra and Graunke left in the Range Rover after dinner. Later that evening, Michelle called Electra and instructed her to return the Range Rover; Michelle did not want a "crowd of people sitting in her car."

¶ 37   Electra was a good driver, and there was no conversation suggesting otherwise. After the accident, Michelle and Sopko did not tell Milton that Electra was not supposed to have used the Lexus.

¶ 38                                    d. Benjamin Graunke

¶ 39   Graunke was Electra's friend from high school. He spent "[m]aybe a couple days" at Electra's apartment in Chicago before he went with her to Michelle's home in Plainfield for dinner. Electra drove a Range Rover, Michelle's car, which he believed was the car Electra regularly drove. After dinner, Electra, Graunke, and two of their friends went to an arcade/bowling alley. Electra drove them in the Range Rover and, upon their return to Michelle's house, the two friends left.

¶ 40     Electra and Graunke saw the Lexus in the garage and the keys hanging on the coat rack in the laundry room. They mutually decided to take the Lexus for a ride around the block, ultimately leading to the accident. Graunke presumed the Lexus had been there for more than a day before the accident "because Athena's car was in the shop and she was using [the Lexus]."

¶ 41     Graunke did not know precisely who was supposed to use the Lexus. He believed Sopko had left the Lexus "for them to use" after Athena's car had broken down. Nothing was said at dinner about who could or could not drive the Lexus. Graunke did not ask Sopko for permission to use the Lexus, nor did he hear Electra ask for permission to use the Lexus. Nobody told him Electra was not supposed to use the Lexus.

¶ 42                                    e. Athena Roumeliotis

¶ 43     At the time of the accident, Athena was a student at the University of Arizona. In late June 2017, she came home for the summer after having spent some time studying abroad in Italy. She was living at Michelle's house, and Electra "was living in the city in her own place." Athena was supposed to return to Arizona at "the end of July, beginning of August."

¶ 44     Electra met Sopko for the first time at the July 17 dinner. Sopko and Michelle were dating at the time, but Athena did not approve of the relationship. At dinner, Athena and Electra were arguing about who would use Michelle's car because they were short of a car. Athena's car was "close to college," and the car Electra typically drove, a BMW, was in the repair shop after a "kind of a fender bender, not anything too serious."

¶ 45     Sopko said "he was going to bring his car over for us to use." Athena responded, "No, no don't bring the car[.] We'll figure it out ourselves." But Sopko insisted on bringing the car.

9

¶ 46        Sopko did not designate Athena as the Lexus's intended user. Nor did he expressly allow Electra to drive the Lexus. "He never specifically said, you or you. It was kind of all general, the car is for you guys to use."

¶ 47        Athena had no intention of driving the Lexus and never took possession of its keys. Sopko tried to give her the keys but she did not accept them, telling him she did not want them. Athena believed Sopko placed the keys on the kitchen counter. Because Athena did not approve of Sopko's relationship with Michelle, she "just wasn't interested in borrowing anything from him."

¶ 48        Athena agreed Electra seemed like "a good competent driver." Both Athena and Electra were allowed to drive Michelle's Audi R8. They were also allowed to drive Lawrence's Maserati but never did.

¶ 49                                 f. Chris Allen

¶ 50        Allen was the Plainfield police detective investigating the accident. He spoke with Graunke, Michelle, Milton, Sopko, and Athena. None of them indicated Sopko had expressly permitted Electra to drive the Lexus or prohibited her from doing so.

¶ 51        Allen went to see Graunke at the hospital within hours of Graunke's arrival there. Graunke had sustained major injuries and was unable to remember the crash. About a week later, Allen followed up with Graunke after his discharge from the hospital. Graunke told Allen that Sopko brought the Lexus for Athena to use since she needed a vehicle to travel for work. Graunke also said that he and Electra collectively agreed to take the Lexus out for a joy ride and to show it off.

¶ 52        Michelle told Allen that Sopko brought the Lexus for Athena to use for her work commute. Allen testified, "[Michelle] did not know which vehicle Electra was in during the crash. When I provided her with a description of the vehicle, she was surprised to hear that was the car because she said that [Electra] wasn't supposed to be driving it." When asked if Michelle explained why

10

Electra was not supposed to be driving the Lexus, Allen testified, "Because she didn't have permission to be driving it." Later in the deposition, Allen testified Michelle did not tell him that Electra could not drive the Lexus; "she was just surprised that that was the vehicle that [Electra] was driving."

¶ 53 Milton told Allen that the Lexus was left for Athena's use, not Electra's.

¶ 54 Athena told Allen she did not know why Electra would have been driving the Lexus.

¶ 55 Sopko told Allen that he left the Lexus for Athena to use, but "he didn't specifically say, Electra, you cannot drive the vehicle." Sopko did not say that he allowed Electra to use the Lexus. Allen believed Sopko said the keys were inside the Lexus when he left the residence that evening.

¶ 56                           4. The Court's Ruling

¶ 57 In May 2024, the circuit court entered summary judgment in favor of Pekin and Progressive. It found Electra was not a permissive driver and, therefore, Pekin and Progressive had no duty to defend or indemnify the Estate under their respective policies. It did not address whether Electra was a resident relative under Progressive's policy.

¶ 58 This appeal followed.

¶ 59                           II. ANALYSIS

¶ 60 Graunke contends the circuit court erroneously granted summary judgment. He maintains the record presents triable questions as to whether Electra was (1) a permissive driver under both Pekin's and Progressive's policies and (2) a resident relative under Progressive's policy.

¶ 61                         A. Standard of Review

¶ 62 Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c)

11

(West 2022). Summary judgment should be granted only if the movant's right to judgment is clear and free from doubt. *Heath v. City of Naperville*, 2024 IL App (3d) 230663, ¶ 49.

¶ 63　　　　On a summary judgment motion, the court does not resolve questions of fact; rather, it determines whether a genuine issue of material fact exists at all. *Id.* ¶ 50. Thus, the court may not weigh evidence or assess witness credibility. *Id.* Given the drastic nature of summary judgment, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the nonmovant. *Id.* Summary judgment is not appropriate "where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Id.* We review the grant of summary judgment *de novo. Id.*

¶ 64　　　　　　　　　　　B. Permissiveness of Vehicle Use

¶ 65　　　　The parties do not dispute that, if established, Electra's nonpermissive use of the Lexus would bar coverage to the Estate under both Pekin's and Progressive's policies.

¶ 66　　　　　　　　　　　1. Dead Man's Act

¶ 67　　　　Preliminarily, we address Graunke's contention that the Dead Man's Act (Act) (735 ILCS 5/8-201 (West 2022)) prevents Sopko from testifying that he told Electra she could not touch the Lexus. The Act is intended to protect decedents' estates from fraudulent claims and to place the parties on equal footing in presenting testimony. *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005). The Act bars an adverse party, or a person directly interested in the action, from testifying on his or her own behalf about a conversation with the decedent or any event occurring in the decedent's presence. 735 ILCS 5/8-201 (West 2022). A person is directly interested under the Act "if he or she will directly experience a monetary gain or loss as an immediate result of the judgment." *People v. $5,608 United States Currency*, 359 Ill. App. 3d 891, 895 (2005). The Act does not bar

12

testimony regarding facts that the decedent could not have refuted. *Gunn*, 216 Ill. 2d at 609; *Balma v. Henry*, 404 Ill. App. 3d 233, 240 (2010). The Act applies both in trials and in summary judgment proceedings. *Balma*, 404 Ill. App. 3d at 238.

¶ 68        Graunke's attempt to invoke the Act is unavailing. Only the representative of an estate has standing to invoke the Act. *Id.* at 239. The Act defines "representative" as "an executor, administrator, heir or legatee of a deceased person and any guardian or trustee of any such heir or legatee, or a guardian or guardian *ad litem* for a person under legal disability." 735 ILCS 5/8-201 (West 2022). Graunke does not qualify under this definition. As the Estate's administrator, Michelle is the only party entitled to invoke the Act.

¶ 69        Nevertheless, Graunke argues he "stands in Electra's shoes" as he will receive a monetary gain or loss from the judgment. This argument is a *non sequitur*. Graunke's potential monetary gain or loss has no bearing on whether he is an Estate representative (or whether he stands in Electra's shoes). Graunke conflates the "interested person" standard—used to bar a witness's testimony—with the requisite qualifications for invoking the Act. Compare *5,608 United States Currency*, 359 Ill. App. 3d at 895 (an interested person is one who will directly experience a monetary gain or loss as an immediate result of the judgment), with *Balma*, 404 Ill. App. 3d at 239 (only the estate representative can assert or waive the Act). In any case, Graunke's argument that he represents the Estate is plainly refuted by the record. Sopko's deposition testimony was taken in the underlying action, when Graunke *was suing the Estate*. In that context, Graunke's interests were clearly opposed to the Estate's interests. Thus, by any measure, Graunke lacks standing to invoke the Act.

¶ 70        Further, even if Graunke had standing to invoke the Act, it does not apply to Sopko's testimony. The Act applies only to the testimony of (1) adverse parties or (2) persons directly

13

interested in the action. 735 ILCS 5/8-201 (West 2022). Given that Sopko is not a named party, his only conceivable status is that of an interested person. An interested person under the Act is one who "will directly experience a monetary gain or loss as an immediate result of the judgment." *$5,608 United States Currency*, 359 Ill. App. 3d at 895. Graunke maintains Sopko is an interested person because he stands in Pekin's shoes as its insured. Graunke cites *State Farm Mutual Automobile Insurance Co. v. Plough*, 2017 IL App (2d) 160307, for the proposition that a nonparty insured may qualify as an interested person in his or her insurer's action. *Plough* is distinguishable, however. In that case, the court found the insured was an interested person because he stood to gain or lose a $250 deductible as an immediate result of the case outcome. *Id.* ¶ 12. Here, in contrast, Sopko does not stand to gain or lose any money as an immediate result of the outcome of Pekin's action. Accordingly, Sopko is not "directly interested in the action" and his testimony is not barred by the Act.

¶ 71                                            2. Hearsay Testimony

¶ 72        We next address Graunke's contention that Allen's testimony must be disregarded as inadmissible hearsay. Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Ill. R. Evid. 801 (Oct. 15, 2015). The hearsay rule provides, generally, that a witness may testify only as to facts within his or her personal knowledge. *People v. Peterson*, 2017 IL 120331, ¶ 17 (citing *Novicki v. Department of Finance*, 373 Ill. 342, 344 (1940)). Inadmissible hearsay may not be used to support or oppose a summary judgment motion. *Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶ 52.

¶ 73        Pekin uses Allen's testimony to bolster its argument that Electra was not permitted to drive the Lexus. In particular, Pekin cites Allen's testimony that Michelle appeared surprised upon learning Electra was in the Lexus at the time of the accident and said Electra "wasn't supposed to

14

be driving it." (Allen's testimony as to Michelle's surprised appearance is not hearsay. There is no indication her shift in demeanor was intended as an assertion. See Ill. R. Evid. 801(a), (c) (eff. Oct. 15, 2015).) In the summary judgment context, Allen's testimony of Michelle's verbal reaction can only be offered for its substance. Allen's testimony is therefore inadmissible hearsay, unless an exception applies. Pekin argues, in conclusory fashion, that Allen's testimony is admissible under Illinois Rules of Evidence 803(2) and 803(3) (eff. Jan. 25, 2023). We address each in turn.

¶ 74        Rule 803(2) excludes excited utterances from the rule against hearsay. Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). An excited utterance, also called a spontaneous declaration, is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* The excited utterance exception rests on a theory rooted in human experience that physical or mental shock prompts truthful, unreflecting statements as to facts just perceived. *People v. Connolly*, 406 Ill. App. 3d 1022, 1024 (2011).

¶ 75        To admit a statement under the excited utterance exception, a court must find (1) an event sufficiently startling to generate a spontaneous and unreflecting statement, (2) no time to fabricate the statement, and (3) a nexus between the statement and the startling event's circumstances. *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 31.

¶ 76        Here, Allen testified that when he described to Michelle the vehicle involved in the accident, she said Electra was not supposed to be driving that vehicle. He later testified, "[Michelle] didn't say that Electra couldn't drive the car[.] *** [S]he was just surprised that that was the vehicle that she was driving." The motions for summary judgment rely on Allen's initial testimony—that Michelle said Electra was not supposed to be driving the Lexus. This testimony does not qualify as an excited utterance. Michelle's alleged statement was in response to Allen's description of the vehicle involved in the accident. A verbal account of the accident's details is not

15

the type of startling event or condition that can prompt an excited utterance. See *People v. Durham*, 303 Ill. App. 3d 763, 766 (1999) ("While viewing a photograph of a person who shot him may have caused [the victim] anguish or anger, this is not the type of startling event that causes an excited utterance under the hearsay rule."). Pekin fares no better by claiming the startling event or condition was the accident itself, as an excited utterance requires the declarant's personal knowledge of the startling event or condition. *People v. Garner*, 2016 IL App (1st) 141583, ¶ 51. A secondhand account of Michelle's response to learning the details of her daughter's accident, of which she had no firsthand knowledge, is not admissible as an excited utterance.

¶ 77 Pekin also relies on Rule 803(3), which sets forth the state-of-mind exception to the hearsay rule. Ill. R. Evid. 803(3) (eff. Jan. 25, 2023). Under this exception, a witness may testify as to statements of a declarant's then-existing state of mind, such as intent, plan, and motive. *Id.*; *People v. Lawler*, 142 Ill. 2d 548, 559 (1991). Notably, Rule 803(3) distinguishes between a statement of a then-existing state of mind and a statement of "memory or belief to prove the fact remembered or believed." Ill. R. Evid. 803(3)(A) (eff. Jan. 25, 2023). While the former is admissible under the exception, the latter is not (except in limited circumstances relating to a declarant's will instrument). *Id.* "A hearsay statement admitted under the state-of-mind exception may only be used for the limited purpose permitted by the exception, not for its own truth." *Guski v. Raja*, 409 Ill. App. 3d 686, 700 (2011).

¶ 78 The statement attributed to Michelle—that Electra was not supposed to drive the Lexus— is not admissible under the state-of-mind exception. Michelle's statement does not reveal her then-existing state of mind (such as her intent, plan, or motive); it merely asserts a belief about past conduct. Thus, Allen's testimony recounts Michelle's "statement of memory or belief," and Pekin attempts to introduce his testimony "to prove the fact remembered or believed." See Ill. R. Evid.

16

803(3)(A) (eff. Jan. 25, 2023). This is precisely what Rule 803(3)(A) was designed to prevent. *Id.* Admitting a declarant's retrospective belief under the guise of state of mind would effectively destroy the hearsay rule. See *In re Estate of Holmgren*, 237 Ill. App. 3d 839, 843 (1992). Having established the inapplicability of the excited-utterance and state-of-mind exceptions, we disregard Allen's hearsay testimony in our analysis.

¶ 79                                3. Triable Question of Fact

¶ 80      The record reveals a conflicting narrative as to whether Electra had permission to drive the Lexus on the night of the accident. In considering the record, we do not weigh evidence or assess witness credibility. *Heath*, 2024 IL App (3d) 230663, ¶ 50. However, we construe the pleadings and evidence strictly against Pekin and Progressive and liberally in favor of Graunke. See *id.*

¶ 81      Milton and Graunke testified that Sopko brought the Lexus because Athena's car had broken down. Milton believed Sopko brought the Lexus for Athena, and Graunke believed Athena had been using the Lexus for more than a day before the accident.

¶ 82      Sopko testified he specifically told Electra she could not touch the Lexus. This testimony, however, does not conclusively resolve the factual dispute. According to Sopko, he made this statement in Milton's presence, while Electra and Graunke were admiring the Lexus. But neither Milton nor Graunke recounted this statement or any other statement suggesting Sopko had prohibited Electra from using the Lexus. In fact, Milton, who was Sopko's friend, testified, "[I]f [Sopko] says you could drive his car, anyone could drive his car. He's that kind of person."

¶ 83      Graunke testified he believed Sopko left the Lexus "for *them* to use." (Emphasis added.) Similarly, Michelle testified that on returning from Sopko's house and not finding the Lexus, she was not concerned at all "because the car was left for *them* to use." (Emphasis added.) In context, the plural "them" includes, at a minimum, both Athena and Electra. Athena's testimony further

17

corroborates Michelle's and Graunke's testimony. According to Athena, "[Sopko] never specifically said, you or you. It was kind of all general, the car is for you guys to use."

¶ 84    Indeed, the record supports an inference that Sopko's offer extended to both Athena and Electra. Michelle and Athena testified that, upon hearing Sopko's offer to bring a car, Athena immediately rebuffed his offer. According to Athena, she said to Sopko, "No, no don't bring the car[.] We'll figure it out ourselves." According to Michelle, Athena said she did not want or need a car; but when Electra stayed quiet, Sopko brought it anyway. Thus, it is reasonable to infer that Sopko interpreted Electra's silence as tacit approval and brought the Lexus expecting at least Electra to make use of it.

¶ 85    Moreover, Sopko's stated reason for instructing Electra not to touch the Lexus is contradicted by the testimony of both Milton and Athena. Sopko testified he did not think Electra was a good driver and noted she had recently "wrecked" her own car. Milton, in contrast, stated Electra was a good driver and emphasized there was no conversation about Electra not being a good driver. Athena also believed Electra was a good driver. And although Athena stated Electra's car had been in an accident, she emphasized it was a minor accident. Aside from Sopko's testimony, the record does not indicate Electra was at fault in that accident.

¶ 86    On balance, the record reflects a factual dispute as to the intended recipient of the Lexus and whether Electra was expressly prohibited from driving it. Sopko testified he specifically told Electra she could not touch the Lexus, but no other witness heard that alleged prohibition. Michelle and Athena both testified the Lexus was for either sister to use, while Sopko, Graunke, and Milton testified Sopko brought the Lexus specifically for Athena to use. Viewed in the light most favorable to Graunke, the deposition testimony presents a genuine issue of material fact as to whether Electra had permission to drive the Lexus.

18

¶ 87                                   C. Resident Relative under Progressive's Policy

¶ 88            Progressive's summary judgment motion raised an additional basis for denying coverage, namely, that Electra was not a covered driver because she did not reside with Lawrence, the named insured, at the time of the accident. Although the circuit court did not address this issue, it was fully briefed, and *de novo* review compels us to consider it. See *Clay v. Illinois District Council of Assemblies of God Church*, 275 Ill. App. 3d 971, 980 (1995).

¶ 89            It is undisputed that Progressive owes the Estate no coverage if, at the time of the accident, Electra was not a qualifying "relative" under Progressive's policy. We begin by examining the policy's language.

¶ 90            "[A] contract must be construed as a whole, viewing each part in light of the others." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). "Where a policy provision is clear and unambiguous, its words must be given their plain, ordinary, and popular meaning." *Hilltop View, LLC*, 2013 IL App (4th) 130124, ¶ 26. But if the terms are ambiguous, the language will be strictly construed against the insurer. *Id.* "In addition, provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer." (Internal quotation marks omitted.) *Id.*

¶ 91            Under Progressive's insuring agreement, the declarations page forms part of the policy. The declarations page expressly mentions Electra's name twice, first in the "drivers and resident relatives" section, and then in the "premium discounts" section where she is identified as a distant student. Although Electra is not specifically designated a "resident relative," we strictly construe the "drivers and resident relatives" section against the insurer (see *id.*) and find she is necessarily listed as both a driver and a resident relative. Moreover, the declarations page lists a BMW 320 as a vehicle recently added to the policy, and Athena testified Electra typically drove a BMW; the

19

declarations page also lists a Range Rover as a covered auto, and there is abundant testimony that Electra drove her mother's Range Rover. The declarations page lists no other vehicles. In view of the declarations page and testimony that Electra drove both covered autos, the insurer and insured clearly contemplated coverage would extend to Electra.

¶ 92    But the declarations page is only part of the policy (*Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 23 (2005)), and Progressive asserts the declarations page includes misrepresentations precluding coverage.

¶ 93    Progressive maintains Electra was neither a resident relative nor a distant student at the time of the accident. "Distant student" is mentioned nowhere outside the declarations page and has no clear connection to the definition of "insured" under the policy. Accordingly, we consider whether the evidence overcomes, beyond question, Electra's ostensible status as a resident relative.

¶ 94    The policy contract's definition of "relative" is two-pronged. It requires, first, a person related by blood, marriage, or adoption to "you," *i.e.*, the named insured, or the named insured's spouse *if the couple resides in the same household at the time of the loss*. Here, the evidence conclusively establishes Michelle and Lawrence were residing in separate households at the time of the accident. Michelle testified she was in the process of divorcing Lawrence, and Milton testified Michelle was separated from Lawrence and living in her own home. Nothing in the record undermines Michelle's and Milton's testimony. Thus, during the period of separation, Michelle is excluded from any reference to "you" in the policy. "You" can only refer to Lawrence, the named insured. Even so, the definition of "relative" recognizes "stepchild" as a qualifying relationship. As Lawrence's stepdaughter, Electra satisfied the first prong of that definition.

¶ 95    The second prong of the definition sets forth a residency requirement: A relative must "resid[e] in the same household as you [*i.e.*, the named insured]." Notably, unmarried dependent

20

children temporarily away from home satisfy this prong "if they intend to continue to reside in [the named insured's] household."

¶ 96      Residency is generally construed liberally in favor of the insured and strongly against the insurer. *State Farm Mutual Automobile Insurance Co. v. Bierman*, 2019 IL App (5th) 180426, ¶ 29. "The reasonable interpretation, however, requires a case-specific analysis of intent, physical presence, and permanency of abode in each case." *Id.* "The controlling factor is the intent of the party whose residency is in question, as evinced by that party's actions." *Id.* "Although a person can have only one domicile at a time, a person may have multiple residences." *Id.*

¶ 97      Progressive draws our attention to Michelle's deposition testimony regarding Electra's Chicago residence. Michelle testified Electra had an apartment in Chicago. According to Progressive, this is conclusive evidence that Electra was not residing in the same household as Lawrence at the time of the accident. We disagree. At most, the record shows Electra's *primary* residence was in Chicago, where she lived alongside a roommate. Progressive's policy contains no requirement that a resident primarily reside in the named insured's household. It is possible that Electra primarily resided in her Chicago apartment but maintained residency in her parents' households. See *id.* (a person can have multiple residences simultaneously). Indeed, the policy's definition of "relative" contemplates dependent children temporarily away from home who intend to continue to reside in their parent's household.

¶ 98      As the party moving for summary judgment, Progressive "is the burdened party for purposes of the motion and must meet both the initial burden of production [citation] and the ultimate burden of proof." *Country Mutual Insurance Co. v. Hilltop View, LLC*, 2013 IL App (4th) 130124, ¶ 23. Progressive failed to present any evidence or elicit any testimony regarding Electra's residency-related intent or the permanence of her Chicago abode. See *Bierman*, 2019 IL App (5th)

21

180426, ¶ 29. It failed to obtain a sworn statement from Lawrence concerning Electra's residency. It also failed to obtain any evidence showing Electra had no intention of returning to Lawrence's household (assuming she did not reside in his household at the time). Notably, any deposition testimony adduced regarding Electra's residency arose incidentally, in a wholly separate proceeding, and was not the product of focused inquiry.

¶ 99       Thus, because the declarations page identifies Electra as a resident relative and the testimonial record does not conclusively prove otherwise, a genuine issue of material fact exists, and summary judgment is inappropriate.

¶ 100                                    D. Necessary Party

¶ 101       Finally, Graunke argues the summary judgment order was void because Lawrence was not joined as a necessary party. Citing *Safeway Insurance Co. v. Harvey*, 36 Ill. App. 3d 388, 392 (1976), Graunke's opening brief offers only a bare assertion that Lawrence's named-insured status under Progressive's policy requires his joinder to the action as a necessary party. Graunke does not discuss *Harvey* and provides no analysis of the established bases for joinder of necessary parties. See *American Freedom Insurance Co. v. Garcia*, 2021 IL App (1st) 200231, ¶ 36 (setting forth three bases for joinder).

¶ 102       *Harvey* does not stand for the proposition that an insured is necessary to an insurance action *solely* by virtue of his or her named-insured status under the relevant policy. In *Harvey*, an insurer filed a declaratory judgment action to rescind the named insured's policy after his brother was involved in an automobile accident. *Harvey*, 36 Ill. App. 3d. at 390-92. The insurer alleged the policy was procured through misrepresentation of fact material to the risk and that no duty to pay, defend, or indemnify arose. *Id.* at 390. The trial court entered summary judgment in favor of the

22

insurer. *Id.* On appeal, the appellate court held that policy rescission injuriously affected the named insured's interest since his rights in the policy were purportedly determined. *Id.* at 391.

¶ 103    Here, in contrast, Progressive's crossclaim does not seek to rescind the policy or determine Lawrence's rights under the policy. It seeks only a finding that Progressive has no duty to defend or indemnify any party in the underlying action. Thus, the only case relied on by Graunke is distinguishable.

¶ 104    "A reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which an appellant may dump the burden of argument and research." (Internal quotation marks omitted.) *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009). Graunke's opening brief fails to address any of the bases for joinder. See *Garcia*, 2021 IL App (1st) 200231, ¶ 36. Graunke's failure to develop his argument violates Rule 341(h)(7). Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." *Id.* Accordingly, Graunke has forfeited this argument, and we decline to address it further.

¶ 105                                III. CONCLUSION

¶ 106    Whether Electra had permission to use the Lexus is a disputed question of fact, and the record is insufficiently developed as to Electra's resident-relative status under Progressive's policy. Thus, genuine issues of material fact exist, and summary judgment is inappropriate.

¶ 107    We reverse the judgment of the circuit court of Will County and remand the cause for further proceedings.

¶ 108    Reversed and remanded.