(No. 29635.—

WALTER E. MILLER, Appellant, *vs.* ALBERT MILLER *et al.* —(ALBERT MILLER, Appellee.)

*Opinion filed November 20, 1946.*

274

WEILEPP & WILSON, of Decatur, and HAWBAKER & SIEVERS, of Monticello, (E. J. HAWBAKER, of Monticello, of counsel,) for appellant.

MARK O. ROBERTS, of Springfield, and N. E. HUTSON, of Monticello, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

The plaintiff, Walter E. Miller, brought an action in the circuit court of Piatt county against the defendants, Albert Miller and the Illinois Central Railroad Company, to recover damages for personal injuries sustained in a collision on September 29, 1942, between a tractor-trailer truck, owned and driven by his brother, Albert Miller, and a train owned and operated by the railroad company. Albert Miller filed a counterclaim against Walter E. Miller and the railroad company. A jury found Albert Miller guilty upon the original complaint, and awarded Walter E. Miller damages in the sum of $3000. The railroad company was found not guilty. Judgment was rendered on the verdict. The trial court granted the company's motion for a directed verdict at the conclusion of the counter-claimant's evidence. Albert Miller prosecuted an appeal to the Appellate Court for the Third District. The judgment against him and in favor of the railroad company on the counterclaim was affirmed, and the judgment rendered in favor of Walter Miller and against Albert Miller was reversed. (*Miller* v. *Illinois Central Railroad Co.* 328 Ill. App. 171.) Upon the petition of Walter Miller, the Appellate Court has granted a certificate of importance and allowed a further appeal to this court.

The issues have been narrowed, the railroad company is not a party to this appeal, and the only question presented for our decision is whether Walter E. Miller, hereafter referred to as plaintiff, was a passenger for hire, or, instead, a guest, within the contemplation of the Guest Act of this State, of Albert Miller, who will be designated as the defendant. Section 1 of the statute, (Ill. Rev. Stat. 1945, chap. 95½, par. 58a,) so far as relevant, provides: "No person riding in a motor vehicle as a guest, without payment for such ride, * * * shall have a cause of action for damages against the driver or operator of such motor vehicle or its owner or his employee or agent for

injury, death or loss, in case of accident, unless such accident shall have been caused by the wilful and wanton misconduct of the driver or operator of such motor vehicle or its owner or his employee or agent and unless such wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought." Plaintiff's complaint does not charge wilful and wanton misconduct by defendant in the operation of the truck. It follows that if plaintiff was riding in the truck "as a guest, without payment for such ride," the action cannot stand, and the Appellate Court properly reversed the judgment of the circuit court. A review of the relevant facts relating solely to this question is required.

Plaintiff and defendant reside in the same neighborhood near Cisco, in Piatt county. At the time of the accident, plaintiff was sixty-two years of age and his brother, the defendant, sixty-seven. Plaintiff, a farmer, operated 1500 acres and raised livestock. Defendant owned two trucks equipped for hauling livestock. He was licensed by the State of Illinois to transact and engage in the trucking business and, since 1933, had been transporting livestock on tractor-trailer type trucks. From plaintiff's testimony it appears that he shipped hogs and cattle to various markets by truck and that defendant hauled most of his livestock to Chicago. Defendant testified that he had hauled cattle for hire fifteen or twenty times for plaintiff. A short time prior to September 27, 1942, plaintiff told his brother that he wanted him to haul two truckloads of fat cattle to Chicago; that he inquired of defendant how cattle were then selling on the market, and that defendant advised him he would charge twenty-five cents, "or it might have been thirty cents" per hundred pounds. Plaintiff also told his brother that he, personally, wished to take the cattle to Chicago, and "stay and see them sold." He also said that he did not always accompany defendant, and that he went largely because of "the price and to take care of the

cattle we took up." He added that he told defendant he would probably buy a saddle horse and asked if he could bring the horse back, and that defendant replied he expected to haul eight steers for a neighbor, Charley Olson, and would have room for the horse. The two truckloads of cattle owned by plaintiff were driven to Chicago on Sunday night, September 27, by two of defendant's employees. Plaintiff rode on a truck driven by one of these men. He remained in Chicago and superintended the sale of his cattle at the Union Stock Yards on Monday, September 28. Defendant's employees returned to Cisco on Monday with the trucks. Defendant, alone, drove one of the trucks back to Chicago on Monday evening, taking a load of cattle belonging to a person not involved in this litigation. Plaintiff testified that, Tuesday morning, after unloading the cattle, he and his brother loaded eight steers and two horses on the truck. One of the horses had been purchased by plaintiff for himself and the other, a race horse, plaintiff was taking to Cisco for Tom Cross. Plaintiff, it appears, also bought a saddle, bridle and blanket. The horses were blanketed, plaintiff assisting, to prevent them catching colds. Defendant, with plaintiff seated by him, carrying eight steers, two horses and the riding equipment, drove the truck from Chicago on the return trip. Plaintiff had never driven the truck at any time. When interrogated as to whether he paid defendant for the trips, he answered: "Surely, and I paid him for everything but bringing the horse down." This, he explained, by stating that he was to pay defendant if the latter delivered the horses, but that he did not do so. He added that he paid defendant for hauling his cattle to Chicago, and that these charges were always taken out of the proceeds of the sale of the cattle. When asked the direct question concerning the arrangements made prior to leaving Cisco, plaintiff stated that his brother said he would haul the horses back. "Of course, I don't think there was anything said about

whether he charged me or not. He always had charged and he knew I expected to pay him." He also testified that, on occasions of the character in controversy, "I went to look after my stuff," that he did not pay anything extra because of the fact he rode in the truck at any time, and "If you would go and see to your cattle selling, they would bring more." Plaintiff also said that had he used some other means of conveyance, he could have accomplished the same results "but I would lots rather go with my cattle."

Defendant testified that, on the Sunday preceding the accident, he arranged to have some cattle delivered in Chicago for plaintiff, and that the latter helped load the cattle. Defendant went to Chicago on Monday afternoon, as related, first going to Olson's farm to load cattle, and arrived in the city about eight o'clock in the evening. He and plaintiff occupied the same hotel room in Chicago Monday night. Defendant arranged to return to Cisco the next day, Tuesday. That morning, plaintiff and defendant breakfasted together quite early and then went to the stockyards where defendant, assisted by plaintiff, loaded eight head of cattle for Olson. When the cattle were loaded, plaintiff and defendant went a short distance to get the riding horse purchased by plaintiff. Defendant testified that he, plaintiff, and an employee, loaded the saddle horse; that an employee went over in the yards and brought another horse to load, namely, Tom Cross's horse, and that they then started home. When asked what arrangements plaintiff had made with respect to riding in the truck, defendant said, "Well, he didn't need to make any arrangements, when they want to ride, they just pile in, that is all there is to it;" that nothing was said about him riding; that, the day before, plaintiff said: "I will go up with these boys and when you come up with Olson's cattle, I will stay over and come back with you." Defendant testified, further, that the usual method in which he handled livestock was: "We load up and we get paid for hauling their cattle

and we don't expect any help from anybody else, but if they go along and want to help they sure get a chance to," and that this situation obtained on the occasion in controversy. To support his counterclaim against the railroad company, defendant testified that the charge on return shipments from Chicago "where we took a load up there for a man" was fifteen cents per hundredweight, or half the charge for hauling livestock to the city. Evidence that this practice applied to plaintiff on the return trip for the delivery of his horse is wanting.

Defendant and his brother left Chicago in the late morning of Tuesday, September 29. Plaintiff sat with defendant throughout the return trip. At Gibson City, they proceeded southward on State route 47, defendant explaining that ordinarily he drove a different route, but that his brother's horses were in the back of the truck and had to be unloaded first; that plaintiff had inquired concerning the directions of the return trip and when told that defendant always went by way of Farmer City, plaintiff asked "why don't we go this other way?"; that he assented, and that is how it happened they were near White Heath, 145 miles south of Chicago, at the time of the accident. Referring to the return trip, defendant stated that plaintiff's horses had to be unloaded first; that, taking the other route by way of Farmer City, they would have gone close to Olson's farm first, and it was expected, upon reaching plaintiff's home, that he would assist with unloading the horses before he, defendant, proceeded on with Olson's cattle. When the truck was a short distance north of White Heath a collision between it and the train appeared imminent, and plaintiff jumped, slipped or was thrown from the truck onto the pavement. He, admittedly, suffered serious injuries.

Upon these facts, the decisive question is presented as to whether plaintiff was a passenger for hire in defendant's truck or, instead, a guest. The certificate of importance,

as defendant says, "graciously granted" by the Appellate Court, states that there has been no decision by this court involving the principle as to whether a consignor of livestock may recover for injuries received while accompanying the animals in the conveyance of the consignee while being driven by the consignee, the latter being a duly licensed public or private carrier, pursuant to the Illinois Truck Act. (Ill. Rev. Stat. 1945, chap. 95½, pars. 240 *et seq.*) An examination of the pleadings discloses that there is no reliance placed upon the provisions of this statute by either of the parties. The complaint alludes to the Truck Act by alleging that defendant was duly licensed by the State of Illinois to transact and engage in the trucking business and to make the agreement and contract charged to have been made with plaintiff. Defendant's answer admits that he was licensed by the State, but denies the making of any contract or agreement with plaintiff. Plaintiff's insistence that his action is based on the common law, as it relates to common carriers, confuses the issue made by the pleadings. Defendant was not a common carrier in any sense of the word. He was a private or contract carrier of goods only. Plaintiff is not, therefore, in the same position as the plaintiffs in *Crane v. Railway Express Agency, Inc.* 369 Ill. 110. Two carriers were involved there, one a railway company which was a common carrier of passengers and goods for hire and, the other, an express company, a common carrier of goods only. Since the second carrier was a common carrier with respect to the shipment of goods only, it was competent to make a contract with the shipper of livestock for immunity from liability of the shipper to employees who were accompanying and caring for race horses as attendants, even though such persons and the shipment were carried in a car of the express company. Plaintiff seeks to place himself in the position of a drover accom-

panying livestock. It is true, of course, that a person who travels with the consent of a railroad company, a common carrier of goods and persons, in charge of livestock or property carried by the company for him, is a passenger for hire, even when traveling in charge of animals on a drover's pass, the consideration being his services rendered in caring for the stock or the charge for transporting the shipment. (*Crane* v. *Railway Express Agency, Inc.*) This factual situation is not present in the, case at bar. The rule invoked by plaintiff does not extend to a private or contract carrier licensed and engaged solely in the hauling of livestock by truck, as here. In the *Crane case,* we pointed out that the reason supporting the rule restricting a common carrier of passengers from limiting its liability for injuries to them did not apply to the express agency defendant, a carrier merely of personal property. In the case at bar, defendant was licensed to carry property; he was not licensed to carry persons as passengers and, consequently, no duty rested upon him as a contract or public carrier to transport persons for hire. It follows, necessarily, that the mere fact defendant agreed to transport plaintiff's horse and saddle from Chicago to Cisco and to permit him to ride in the truck, did not mean that he assumed to act as a common carrier of persons. In short, plaintiff could, under the law, ride in the truck as a guest, without payment for the ride, and if he did so, our Guest Act applies to the factual situation.

As stated, the Truck Act is not directly involved in this appeal, despite the comment of the Appellate Court in the certificate of importance. The statute does not purport to change the motor vehicle law applicable to the operation of trucks upon and along the highways. Indeed, the Truck Act is a part of the general law of the State pertaining to motor vehicles in the same manner as is the Guest Act. Whether defendant was a contract carrier or

a private carrier is beyond the scope of the pleadings and the evidence adduced. In any event, such carriers are not common carriers.

The principal issue made by the pleadings is whether plaintiff was a guest in the truck under the Guest Act or a passenger for hire. It was therefore incumbent upon him to show that he was a passenger and not a guest. (*Leonard* v. *Stone*, 381 Ill. 343.) The question who is a guest, within the contemplation of statutes corresponding to our Guest Act, is largely a question for determination in the individual case. (5 Am. Jur., Automobiles, p. 634, sec. 239.) A guest, it has been said, is one who is invited, either directly or by implication, to enjoy the hospitality of the driver of a motor vehicle, who accepts such hospitality and takes a ride either for his own pleasure or on his business, without making any return to or conferring any benefit upon the driver of the motor vehicle other than the mere pleasure of his company. (*Dorn* v. *Village of North Olmsted*, 133 Ohio St. 375; *Langford* v. *Rogers*, 278 Mich. 310; *Crawford* v. *Foster*, 110 Cal. App. 81.) Again, "The relationship which will give rise to the status of a 'passenger' rather than a 'guest' must confer a benefit upon the owner of a definitely tangible nature." (*Voelke* v. *Latin*, 58 Ohio App. 245.) A serviceable distinction between a "passenger" and a "guest" is made in 2 Restatement of Torts, p. 1273, sec. 490. The phrase "passenger in a vehicle" is used to denote the fact that the plaintiff is one who is being carried by another for hire. Conversely, the word "guest" is employed to designate one whom the owner or possessor of a motor car or other vehicle invites or permits to ride with him gratuitously, that is, without any financial return except such slight benefits as it is customary to extend as part of the ordinary courtesies of the road. In the recent case of *Duncan* v. *Hutchinson*, 139 Ohio St. 185, the Ohio Supreme Court

said: "Keeping in mind the purpose of the statute, it would seem that any expense money paid by a person for a ride in an automobile which is not substantially commensurate with the cost of such transportation will not take him out of the guest status fixed by the statute, unless payment for transportation as such was actually agreed upon. The justice of this rule is based on the fact that it would be unfair to hold the motorist to liability for injuries to his guest due to the hazards of transportation, unless the motorist is, in turn, compensated for such transportation in a manner substantially commensurate with the cost and the hazards of the undertaking. On the other hand, where the relationship between the automobile host and a party riding with him has a business aspect and the transportation is supplied for their mutual benefit, any payment or service rendered to the automobile host by such person for the ride will constitute 'payment therefor' and will remove the automobile host from the protection of the statute."

Similarly, we have had occasion to observe, in determining the status of a person riding in a motor vehicle, that consideration is given to the person or persons advantaged by the carriage; that if the transportation confers only a benefit incident to hospitality, companionship or the like, the passenger is a guest. On the other hand, if the carriage tends to promote mutual interests of both the person carried and the driver, or if the carriage is primarily for the attainment of some objective or purpose of the operator, the passenger is not a guest. (*Connett* v. *Winget*, 374 Ill. 531.) *Kruy* v. *Smith*, 108 Conn. 628, is to the same effect.

Parallel fact situations have not been hitherto presented for decision in this State. Courts in other jurisdictions have, however, considered analogous cases. In *TeSelle* v. *Terpstra*, 180 Wash. 73, 38 Pac. 2d 379, it appeared that

defendant Terpstra, a farmer, owned a Ford truck which he used in his business of trucking and hauling. He and plaintiff, TeSelle, made an agreement whereby the former agreed, for $25, to haul the latter's furniture in a truck from the city of Lynden to TeSelle's home in Yakima county. No part of the $25 for hauling the furniture represented consideration for the carriage of TeSelle. With TeSelle's assistance, defendant loaded the furniture onto his truck. The two then started for Yakima, defendant operating the truck, and TeSelle sitting in the seat on right-hand side of the driver. During the trip, defendant lost control of the truck, crashed into a bridge, and TeSelle sustained fatal injuries. The Supreme Court of Washington observed: "That TeSelle was a mere guest, riding in the truck at his own invitation, but with the consent of respondent driver, and for his own benefit and convenience, clearly appears. There is no evidence, not a scintilla, that TeSelle's status was other than that of a mere guest. A person who hires a truck, not licensed to carry passengers, to transport his furniture, and who, with the consent of the driver, and without any agreement to pay, takes a seat with the driver to make the trip with the furniture, is a mere guest to whom there is no liability in the absence of gross negligence." Similarly, there is no evidence, or even an inference flowing from the evidence, in the present case, to show more than an agreement to allow plaintiff to return his horse and riding equipment from Chicago if he made such purchases. When plaintiff rode back in the truck, even if for the incidental purpose of caring for his horse, he was no more a helper than was TeSelle in the Washington case. Plaintiff was riding in the truck at his own request,—true it is, with the consent of defendant, but, at the same time, solely for his own convenience and, no doubt, to save himself the cost of other means of transportation.

In *Klopfenstein* v. *Eads*, 143 Wash. 104, Murray, a traveling salesman, employed defendant Eads's truck to

convey five or six sample trunks from Olympia to Shelton. An agreement was made covering the charge for hauling. No arrangements were made whereby Murray was to ride on the truck but, as it started from Olympia, he asked the driver to stop, got on the driver's seat and continued on the journey. An accident resulted in Murray's death. The court observed: "It is plain deceased did not pay anything for his transportation, did not intend, and was not expected by appellants, to pay. * * * It is plain that the deceased was not a trespasser, because he was riding with the knowledge and apparent consent of the driver of the truck. We are also of the opinion that he was not a passenger for hire. There is nothing in the record to show that he paid, or expected to pay, for his own transportation. It merely shows that he hired the appellants to transfer his trunks from Olympia to Shelton, and that he got in the car without invitation. Further, this truck was not built for carrying passengers, nor is there any showing that at any previous time it had carried any; and under the laws of this state it would not be authorized to carry passengers for hire without having a permit from the state so to do, and it seems to be conceded that it did not have any such permit. It will not be presumed that appellants knowingly violated the law and carried a passenger for hire when they were unauthorized so to do. Merely hiring appellants to haul his trunks would not make him a passenger for hire. It seems to us that the deceased was a mere guest, riding in the truck at his own invitation, but with the consent of the driver and for his own benefit and convenience." In like manner, in the present case, there is no evidence to show that plaintiff paid or expected to pay for his transportation in the case before us. An assumption that he expected to pay for transportation for a horse cannot be extended to an assumption that he intended to pay for his own personal transportation. Defendant's truck was not built for carrying passengers for hire and there is no evi-

dence that, at any time, he had carried passengers for hire. Obviously, the mere hiring of a truck to haul a horse does not, at the same time, make the horse's owner a passenger for hire when there is no payment, direct or indirect, for his transportation and no accommodation, benefit or other consideration moving to the driver of the vehicle.

A fair conclusion from the uncontroverted evidence is that plaintiff did not pay defendant for his transportation from Chicago to Cisco or, indeed, for the trip from Cisco to Chicago, two days earlier. As he himself stated, he went to Chicago on Sunday to personally supervise the sale of his cattle, with the expectation that he would thereby receive a higher price. He added that he could have made the trip to Chicago by "some other means of conveyance" but preferred to accompany his cattle and, for this reason, went on the truck. Upon his arrival in Chicago, he decided to remain for the reason, among others, that he knew his brother was coming to the city the next day, Monday, and had previously advised him of his intention of buying a saddle horse. This, he did. Before he did so, however, the transaction concerning the cattle had been completed and the trucks which brought them to Chicago had returned to Cisco. The testimony narrated with respect to the question of payment affirmatively discloses that plaintiff never testified that he actually paid for his own personal transportation to or from Chicago. It is to be remembered that two separate and distinct transactions are presented by the testimony: one, the hauling of plaintiff's cattle to Chicago and, the other, the hauling of plaintiff's horse, together with the livestock of a third party, from Chicago to Cisco. The second transaction is independent of the first. Plaintiff's return trip with Olson's cattle and his own horse was a separate transaction and, so far as riding in the truck is involved, the transportation was an accommodation to him, personally, and for his exclusive benefit. Conceding that

payment was to be made to defendant for hauling the horse, evidence is still lacking of any consideration, direct or indirect, for plaintiff's personal transportation. His trip to Chicago was unnecessary, so far as the transportation of the cattle was concerned. Referring to the matter of arrangements, defendant stated that arrangements were unnecessary, observing, "When they want to ride they just pile in and that is all there is to it." This testimony is far from sufficient to support plaintiff's allegation that, in order to take care of the livestock being transported by defendant on September 29, he accompanied the animals in the tractor-trailer and that, as a part of the consideration for transporting the horse, he was permitted to ride with defendant. When all the facts and circumstances are considered, the outstanding fact is that plaintiff received free transportation to and from Chicago and not the fact of such minor service as he may have rendered. Indeed, such services as he did perform were largely for himself, and not for the defendant.

We hold that one may be a guest, within the meaning of the Guest Act, whether riding in a tractor-trailer truck, as here, or in a pleasure vehicle. An important, if not decisive, test, under the statute, is payment. Plaintiff's presence was not necessary to proper transportation of the livestock. He was riding purely for his own benefit and convenience and, indeed, at his own invitation. The transportation, here, cannot fairly be said to have promoted the mutual interests of both the person carried, plaintiff, and the driver, the defendant. Nor is there any evidence that defendant would receive any additional livestock transportation from plaintiff, or any other person, by allowing him to ride home on the truck on Tuesday. The transportation was a purely personal accommodation to plaintiff, and promoted the interest of plaintiff, alone, primarily by saving him the cost of other means of transportation.

Plaintiff alleged a passenger-for-hire relationship, and the duty devolved upon him to show that he actually paid for his transportation, and was not, instead, "a guest, without payment." He failed to prove payment, in money or in services, or that, under the applicable law, he occupied the status of a passenger for hire.

The judgment of the Appellate Court is right, and it is affirmed.

*Judgment affirmed.*