2026 IL App (3d) 240618

Opinion filed January 14, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| CARLITO TOLENTINO, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois, |
| | ) | |
| | ) | Appeal No. 3-24-0618 |
| v. | ) | Circuit No. 22-LA-95 |
| | ) | |
| | ) | Honorable |
| CLIFFORD'S TOWING & RECOVERY, LLC, | ) | Neal W. Cerne and |
| | ) | Louis B. Aranda, |
| Defendant-Appellee. | ) | Judges, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justices Anderson and Bertani concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        Plaintiff, Carlito Tolentino, filed a negligence action against defendant, Clifford's Towing & Recovery, LLC, after sustaining injuries from a fall while attempting to exit the cab of defendant's tow truck. Plaintiff alleged the tow-truck driver was negligent for failing to help him safely exit the cab in dark, misty conditions after plaintiff apprised the driver of his vision loss in one eye. Defendant moved for summary judgment, arguing the driver had no duty to assist plaintiff exit the truck's cab. The circuit court granted the motion. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3                                        A. Pleadings

¶ 4        In January 2022, plaintiff filed a complaint alleging defendant, through its agent, was negligent for failing to warn or assist plaintiff as he attempted to alight from the cab of defendant's vehicle, a flatbed tow truck, after plaintiff informed defendant's agent that "he was largely blind in his left eye." The complaint further alleged that defendant owed plaintiff "the highest duty of care as a common carrier" and that both a warning and assistance were "needed given the poor lighting, the plaintiff's vision problems, the multiple steps involved in descending from the vehicle, and the plaintiff's unfamiliarity with the same."

¶ 5        Defendant filed an answer, denying plaintiff's material allegations and otherwise leaving plaintiff to his proof. Defendant specifically denied it was a common carrier, admitting "only those duties imposed on it by Illinois law" and denying "any breach of those duties." Defendant also raised affirmative defenses in the alternative, alleging plaintiff was contributorily negligent and, moreover, plaintiff expressly assumed all risk by executing a waiver agreement in connection with defendant's towing service.

¶ 6                                        B. Depositions

¶ 7        The parties deposed plaintiff and Nino Penaloza, defendant's tow-truck driver.

¶ 8                                        1. *Plaintiff*

¶ 9        Plaintiff testified as follows. At around 8 p.m. or 9 p.m. on December 6, 2021, plaintiff, his wife Lina, and his son Troy, were in the parking lot of Lina's workplace. The steering wheel of Lina's Mercedes vehicle had locked up, and plaintiff was attempting—unsuccessfully—to unlock it. While plaintiff was in the Mercedes, Troy and Lina were in Troy's Ford vehicle, and either Troy or Lina called the American Automobile Association (AAA) for towing service.

2

During the phone call, AAA provided defendant's name and phone number. Troy went over to plaintiff and informed him that "there will be a wait, but they are coming."

¶ 10        Plaintiff, Troy, and Lina waited together in the Ford for the tow truck to arrive. At "maybe" 11 p.m., Troy and Lina left the parking lot in the Ford, and plaintiff waited alone in the Mercedes. During the wait, plaintiff texted Lina to express his growing impatience and to ask for updates. According to plaintiff, Lina texted him that she had told Penaloza, "Please, lend assistance. He has a vision problem." Defendant's counsel asked plaintiff if he could check whether he had that text message. After a break, Plaintiff's counsel read aloud the relevant text conversation:

> "[Lina] said, 'Did they come?' [Plaintiff] responded, "No." That was at 11:25. At 11:42, [Lina] said, 'Please just wait for the guy. His name is Leo. He'll be there. I'm so sorry.' At 11:46, *** [plaintiff] said, 'You said five mins. That was 10 mins ago. *** If he's not here in another 10 mins, I will get Uber.***' And then at 11:50, [Lina] said, 'When I talked to him, he said he's almost there, five min. Ivy will leave now and get you.' And then one minute later at 11:51 p.m., [plaintiff] responded, 'He's here.' And the next is a family photo that's unrelated—"

¶ 11        The tow truck arrived around midnight. It was a large flatbed truck designed to haul cars "on top of the bed." Plaintiff exited the Mercedes, and Penaloza exited the truck. Penaloza apologized for being late. Plaintiff expressed his unhappiness but assured Penaloza it was not his fault. Plaintiff did not ask Penaloza for a ride. Lina had already asked defendant to give plaintiff a ride home, so plaintiff assumed he would ride in the tow truck. While Penaloza and plaintiff were at the back of the tow truck, Penaloza announced without prompting, "Let me clear all my junk from the passenger's side." Penaloza spent around two minutes clearing the space.

3

¶ 12    Plaintiff was shown a photo of the two steps leading to the passenger side of the cab. Plaintiff agreed there were two steps, about 12 inches apart, and that he stepped on both steps to enter the cab. The door was already open, so he grabbed the handle "inside the door." He found it difficult to enter the cab because "it's kind of hard to brace my knee this high. *** [I]t's quite a big step up." He did not ask Penaloza to help him enter the cab; Penaloza "wasn't nowhere [*sic*] in sight."

¶ 13    The drive from the parking lot to plaintiff's home took "maybe 25 minutes." During this time, plaintiff and Penaloza engaged in small talk. Plaintiff told Penaloza he used to drive for Uber. When Penaloza asked why he stopped, plaintiff explained he no longer drives because he lost his vision in his left eye and it was difficult for him to see. Plaintiff suffered from other vision-related conditions, but he did not mention them to Penaloza.

¶ 14    Although plaintiff owns distance glasses, he does not wear them because he no longer drives. For his safety and for the safety of others on the road, plaintiff decided to stop driving in April 2020 because of his vision loss. No eye specialist instructed him to stop driving.

¶ 15    The tow truck arrived at plaintiff's house between midnight and 1 a.m. The house was at a street corner, and the nearest streetlight was at the same corner, though not directly in front of the house. Penaloza reversed the flatbed into plaintiff's driveway. When the tow truck came to a stop, its cab was fully in the street. Plaintiff remarked, "[T]hank God we're here." Keeping the engine on, Penaloza exited the cab and closed his door. Plaintiff waited 30 to 60 seconds before attempting to exit the cab on his own. Although plaintiff did not ask Penaloza to help him exit the cab, he "was hoping" Penaloza would come around and help him.

¶ 16    Plaintiff observed, in the driver's side-view mirror, Penaloza manipulating something "behind the cab door"—something related to unloading the Mercedes. Upon seeing this, plaintiff

4

decided he would try to exit the cab on his own. Plaintiff opened the passenger door and placed his right heel on the upper step. It was dark out, and the weather was "misty and very cold." The nearest streetlight was not in the truck's immediate vicinity and was closer to the driver's side of the truck. Plaintiff rolled down the window so he could hold on to the door frame to help him get down. He held on to the frame with his left hand. Suddenly, his right foot slipped from the upper step and he fell. Plaintiff did not reach the lower step. His left foot struck the ground first, followed by the rest of his body. Plaintiff did not know the distance he fell: "I would be just guessing if I tell you two, three feet." He immediately felt pain in his left leg and cried out. At some point, Lina and Troy came out of the house and saw him lying on the ground. They later told him Penaloza was "banging on the door" of the house and ringing the doorbell to get their attention. Plaintiff instructed Lina to call for an ambulance. When the paramedics arrived, plaintiff told them he broke his leg. He later learned he had broken his tibia and fibula.

¶ 17     Defendant's counsel showed plaintiff a signed invoice for the tow service. The invoice included a liability waiver and identified the Mercedes as the towed vehicle, Troy as the contact, AAA as the authorizing party, and Penaloza as the driver. It included a "tow from" address and a "tow to" address, and listed a $54 total charge, comprising a "tow/hook fee" of $45 and a "loaded/hooked mileage" charge of $9. Plaintiff denied signing the invoice and further denied that Troy had signed it, noting he was familiar with Troy's signature. According to plaintiff, Penaloza did not provide him with "any documents, any invoices, anything" on a tablet or in paper.

¶ 18     Plaintiff was 57 years old on the night in question. He underwent an operation the next morning in which a metal rod was placed in his left leg. Two months later, in February 2022, plaintiff applied for disability benefits due to vision loss, a mobility impairment, and a heart condition. He was awarded disability benefits in November 2022.

¶ 19                                      2. *Penaloza*

¶ 20        Penaloza testified as follows. Defendant was his former employer. Much of defendant's business came from "AAA and insurance calls." Once AAA "sends their stuff," his former boss, Erik, would call the person needing the tow. Plaintiff's wife spoke on the phone with Erik. She pleaded with him to give plaintiff a ride home in the tow truck. Penaloza also spoke with her on the phone, and she reiterated her request that plaintiff be given a ride in the truck.

¶ 21        When Penaloza arrived on scene, he followed his standard procedure. "Everyone signs something. Everyone. Before I even touch their vehicle." He had plaintiff sign on an electronic app called TowBook. He also took pictures of plaintiff's vehicle using TowBook. Penaloza loaded the vehicle, at which point plaintiff declared, "Oh, I'm getting a ride from you." Penaloza responded, "Your wife did ask that." Plaintiff "ended up jumping in" the cab without seeking permission.

¶ 22        En route to plaintiff's residence, the only conversation between plaintiff and Penaloza was a short one about "the big truck and how [plaintiff] was happy to be in it. That's it. Simple words." Inside the cab, plaintiff was "excited like a child, you know, jumping in the truck with no seatbelt on."

¶ 23        On reaching plaintiff's residence, Penaloza reversed the truck into plaintiff's driveway, placed it in park, and was ready to unload the vehicle. Plaintiff did not ask for help to exit the cab. Penaloza and plaintiff both "jumped out" of the cab at the same time. Penaloza's foot was "barely on the first step" when he noticed that plaintiff was gone. Penaloza did not see plaintiff fall. "[Plaintiff] was there and then he wasn't."

¶ 24        Penaloza was surprised plaintiff had fallen: "I don't know how you don't see the step that's there. I don't know what went through his fricking head, dude, but he was on the floor, dude."

6

Plaintiff fell onto the driveway, not the street. "[Plaintiff]'s like 'oh, my leg, my leg.' And I'm like 'what did you do, man?' And he's like 'oh, I fell.' " Penaloza ran to plaintiff's house to alert plaintiff's family and promptly informed his boss.

¶ 25 Plaintiff was not wearing glasses and never mentioned having any vision problems. When plaintiff's counsel asked Penaloza whether he offered to help plaintiff exit the cab, Penaloza responded, "Why would I help him? He didn't tell me he was handicap [*sic*]. Why would I help him? He didn't advise him [*sic*] that he was hurt. Why would I help him? A normal person. A grown-a** man. Why would I help him?"

¶ 26                                           C. Summary Judgment

¶ 27 In November 2023, defendant moved for summary judgment. The circuit court granted defendant's motion, finding defendant did not bear a heightened duty of care because it was not a common carrier. It further found, based on the circumstances, that the accident was not foreseeable and, therefore, that defendant owed no duty. In September 2024, the circuit court denied plaintiff's motion to reconsider.

¶ 28 This appeal followed.

¶ 29                                              II. ANALYSIS

¶ 30                                           A. Standard of Review

¶ 31 Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). Given the drastic nature of summary judgment, the court must construe the record strictly against the movant and liberally in favor of the nonmovant. *Heath v. City of Naperville*, 2024 IL App (3d) 230663, ¶ 50. It may not weigh evidence or assess witness credibility; its role is

simply to determine whether a triable question of fact exists. *Id.* Summary judgment should be granted only if the movant's right to judgment is clear and free from doubt; it is not appropriate "where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Id.* ¶¶ 49-50. Conversely, if the undisputed facts allow only one conclusion, the issue becomes one of law properly resolved by summary judgment. *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80, 84 (1996).

¶ 32        We review the grant of summary judgment *de novo*, and we may sustain the circuit court's decision on any ground supported by the record, regardless of the basis for the court's decision and the accuracy of its reasoning. *Aboufariss v. City of De Kalb*, 305 Ill. App. 3d 1054, 1058-59 (1999).

¶ 33                                B. Negligence Theory

¶ 34        Preliminarily, we note that plaintiff's negligence action is based purely on *respondeat superior* grounds. The complaint's single count alleged that defendant's "agent, employee, and/or servant" was "acting within the scope of his employment and/or agency" at all relevant times, that defendant "through its agent, servant, and/or employee" owed the highest duty of care to plaintiff at all relevant times, and that defendant "through its agent, servant, and/or employee" was negligent. "Under traditional *respondeat superior* analysis, a principal can be found vicariously liable for the torts of his agent committed within the scope of the agency or employment." *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245, ¶ 79. Defendant does not dispute that, at the time of plaintiff's injury, Penaloza was its agent acting within the scope of the agency or employment. Thus, we will presume as much and limit our analysis to the possibility of vicarious liability.

¶ 35        To recover in a negligence action, a plaintiff must establish "the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). A plaintiff's failure to establish any of these elements entitles the defendant to summary judgment. *Smith v. Tri-R Vending*, 249 Ill. App. 3d 654, 658 (1993). Here, the parties dispute the first element: the existence of a duty of care.

¶ 36        "Whether a duty exists in a particular case is a question of law for the court to decide." *Marshall*, 222 Ill. 2d at 430. "The duty inquiry focuses on whether the plaintiff and the defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 22. This inquiry "must begin with the threshold question of whether the defendant, by his act or omission, contributed to a risk of harm to this particular plaintiff." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 21. If the answer is "yes," the court determines whether a duty exists by weighing the four duty factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Id.* If the answer is "no," the court considers whether a recognized "special relationship" creates a duty. *Id.* On the record before this court, the answer to the threshold question is "no."

¶ 37                    1. *Special Relationship as a Prerequisite to Duty*

¶ 38        "A party must recover, if at all, according to the case he has made for himself by his pleadings." *American Standard Insurance Co. v. Basbagill*, 333 Ill. App. 3d 11, 15 (2002). Plaintiff alleged that defendant, through Penaloza, owed him "the highest duty of care as a common carrier." Based on this elevated standard of care, plaintiff alleged Penaloza failed to take prophylactic action

9

beyond his tow-trucking responsibilities: (1) "to assist plaintiff in alighting from [defendant's] vehicle" and (2) "to warn plaintiff as he attempted to alight from the vehicle." Critically, plaintiff did not allege Penaloza's negligent conduct created, or otherwise contributed to, the risk of harm to plaintiff. According to the complaint, the risk of harm to plaintiff was caused by "the poor lighting, the plaintiff's vision problems, the multiple steps involved in descending from the vehicle, and the plaintiff's unfamiliarity with the same." At no point did the complaint allege Penaloza was to blame for any of these conditions. Thus, where plaintiff's theory seeks to impose a duty of care on an otherwise blameless employee, plaintiff must establish the existence of a recognized special relationship. See *Simpkins*, 2012 IL 110662, ¶ 21; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 (Am. L. Inst. 2012) (providing generally that "[a]n actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other").

¶ 39 Plaintiff, however, argues Penaloza's duty to act arose when plaintiff informed him he was "largely blind in his left eye" and it was difficult for him to see. Even if true, these circumstances do not change the fact that Penaloza did not create the risk of harm to plaintiff. Under *Simpkins*, Penaloza owed no duty to plaintiff absent a special relationship. See *Simpkins*, 2012 IL 110662, ¶ 21. Moreover, "the mere fact that an actor realizes or should realize that his action is necessary to aid another, while imposing a possible moral duty to act, does not impose a legal duty to act." *Quiroz v. Chicago Transit Authority*, 2022 IL 127603, ¶ 34 (citing Restatement (Second) of Torts § 314 (1965)).

¶ 40 The restricted path to duty under *Simpkins* is further compelled by the affirmative nature of the duty sought to be imposed. See *Bogenberger*, 2018 IL 120951, ¶¶ 34-35 (framing issue in affirmative-duty terms despite the parties' failure to do so). "[A]n affirmative duty to aid or protect

10

another against an unreasonable[1] risk of physical harm *** arises *only* within the context of a legally recognized 'special relationship.' " (Emphasis added.) *Id.* ¶ 33. Rather than fault Penaloza for negligently executing his normal, paid role, plaintiff's theory proceeds from Penaloza's failure to act beyond that role. Indeed, granting plaintiff every favorable inference, the record contains no basis to conclude that ensuring plaintiff's safe exit from the tow truck fell within Penaloza's employment duties. (Although plaintiff testified Lina informed him by text message that she had asked Penaloza, "Please, lend assistance. He has a vision problem," a mere request cannot expand the scope of Penaloza's employment duties.[2]) Plaintiff thus seeks to hold defendant liable for Penaloza's failure to take affirmative steps that are ordinarily taken, if it all, gratuitously and as a matter of courtesy. Therefore, by seeking to impose liability for Penaloza's failure to intervene, plaintiff advances a theory predicated on a quintessentially affirmative duty. Such a duty can only arise from a special relationship between plaintiff and Penaloza as defendant's agent. See *id.*

¶ 41                    2. *"Common Carrier and Passenger" Relationship*

¶ 42         Our supreme court has recognized four special relationships that permit imposing an affirmative duty: (1) common carrier and passenger, (2) innkeeper and guest, (3) custodian and ward, and (4) business invitor and invitee, *i.e.*, "possessor of land who holds it open to the public

---

[1]This qualification implies that a *reasonable* risk of harm may foreclose an affirmative duty to aid or protect—even in the context of a special relationship. See *Bogenberger*, 2018 IL 120951, ¶ 33. The reasonableness of a risk of harm, in turn, depends on the character of the conditions underlying that risk. See, *e.g.*, *Horcher v. Guerin*, 94 Ill. App. 2d 244, 248 (1968) (a risk of harm is unreasonable if caused by "hidden, unusual or not to be expected dangers from the premises"). Nonetheless, because a risk inquiry would hinge on a negative implication not compelled by *Bogenberger*, we do not pursue it here.

[2]In any event, this testimony constitutes double hearsay. See *Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶ 52 ("Evidence, such as hearsay, that is inadmissible at trial, may not be considered in support of or in opposition to a summary judgment motion."). It relayed an out-of-court statement, the alleged text message, which itself relayed an out-of-court statement, the alleged request, for the truth of the matter asserted. See Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Notably, the alleged text message was not in the text exchange read aloud during plaintiff's deposition.

and member of the public who enters in response to the possessor's invitation." *Id.*; *Marshall*, 222 Ill. 2d at 438-39. Absent one of these relationships, Penaloza had no affirmative duty to act, and we are foreclosed from considering the traditional duty factors. *Bogenberger*, 2018 IL 120951, ¶¶ 37, 41 (citing *Iseberg v. Gross*, 227 Ill. 2d 78, 101 (2007)).

¶ 43        Plaintiff argues a special relationship existed between the parties, namely, that of common carrier and passenger. In general, our common law classifies carriers in two respects: either as common or private, and either as carriers of property or of passengers. *Crane v. Ry. Express Agency, Inc.*, 369 Ill. 110, 115 (1938). These distinctions combine to form four primary carrier types: common carriers of property, common carriers of passengers, private carriers of property, and private carriers of passengers. See *Meyer v. Rozran*, 333 Ill. App. 301, 306-07 (1948) (contrasting common and private carriers of property); *Rathbun v. Ocean Accident & Guarantee Corp.*, 299 Ill. 562, 566-67 (1921) (contrasting common and private carriers of passengers). "[T]he test to distinguish a common carrier from a private carrier is whether the carrier serves all of the public alike." *Browne v. SCR Medical Transportation Services, Inc.*, 356 Ill. App. 3d 642, 646-47 (2005). Thus, a common carrier of property is one who, as a regular business, transports goods for hire, for all applicants indiscriminately, and thereby assumes liability for refusing to transport goods without excuse. *Meyer*, 333 Ill. App. at 306. Similarly, a common carrier of passengers is "one who undertakes for hire to carry all persons indifferently who may apply for passage so long as there is room and there is no legal excuse for refusal." *Illinois Highway Transportation Co. v. Hantel*, 323 Ill. App. 364, 377 (1944). In contrast, a private carrier transports by special agreement in particular instances only, either gratuitously or for hire, and is not bound to serve all who apply. *Doe v. Rockdale School District No. 84*, 287 Ill. App. 3d 791, 794 (1997).

¶ 44 A carrier's classification is a question of fact that turns on the character of the carrier's business and the nature of the service performed in the particular instance. *Long v. Illinois Power Co.*, 187 Ill. App. 3d 614, 630 (1989). Thus, a carrier may operate as a common carrier in two capacities when, as a regular business, it transports both goods and people. See *Miller v. Miller*, 395 Ill. 273, 280 (1946) (citing *Crane*, 369 Ill. 110 (railroad company was a common carrier of both passengers and property)). Moreover, a common carrier in one capacity may be a private carrier in another capacity when it transports subjects outside the scope of its business. See *id.* at 281 (express agency, though it permitted shipper's employees to accompany and attend to horses in transit, was a common carrier of goods only).

¶ 45 Plaintiff contends defendant is a common carrier but does not specify whether he believes defendant is a carrier of passengers or property. He asserts, however, that the court in *Navistar Financial Corp. v. Allen's Corner Garage & Towing Service, Inc.*, 153 Ill. App. 3d 574 (1987), recognized a tow-truck operator was "a common carrier of *goods*." (Emphasis added.) Plaintiff's word choice is telling. Although that case's context supports plaintiff's assertion, the court never once used the term "common carrier of goods." The *Navistar* court found the defendant tow-truck operator was simply a "common carrier." *Id.* at 577. Plaintiff's own words thus reveal an underlying concession that tow-truck operators fall within the class of carriers of *property*.

¶ 46 Plaintiff also concedes that a tow truck is not a passenger vehicle. He observes that defendant's tow truck is a "large commercial motor vehicle," which is "far different than typical passenger vehicles." Plaintiff's concession notwithstanding, it is common knowledge that tow trucks are not designed for passenger transport and that a towing business is limited to vehicle assistance and vehicle transport. See 625 ILCS 5/1-205.1 (West 2022) (defining "tow truck," in part, as a truck "designed or altered and equipped for and used *** to render assistance to disabled

13

vehicles"). Moreover, tow-truck operators are not eligible for licensing as carriers of passengers. The Illinois Vehicle Code restricts eligibility for such licensing to those who transport passengers for hire. See *id.* § 18c-6103(1) (requiring a "motor carrier of passengers" to possess "a valid license authorizing such operations."); *id.* § 18c-1104(19) (defining "motor carrier of passengers" as any person engaged in the for-hire transportation of passengers). Unlike a motor carrier of passengers, a tow-truck operator performs "non-relocation towing," which is the for-hire transportation of vehicles and other wheeled property. See *id.* § 18c-1104(21) (defining "non-relocation towing"). Simply, a tow-truck operator does not undertake to carry passengers for hire, let alone all applicants indifferently "so long as there is room and there is no legal excuse for refusal." *Hantel*, 323 Ill. App. at 377. Defendant is, at best, a common carrier of vehicles only.[3]

¶ 47    Courts have long held that a carrier's incidental transport of a subject outside the scope of its business does not give rise to common-carrier status as to that subject. See *New York Central R.R. Co. v. Lockwood*, 84 U.S. 357, 377 (1873); *Baltimore & Ohio and Southwestern Ry. Co. v. Voigt*, 176 U.S. 498, 520 (1900). This principle is illustrated in *Long* and *Miller*, two Illinois decisions involving a carrier who provided a courtesy ride to spare the plaintiff from arranging alternative transportation. *Long*, 187 Ill. App. 3d at 630; *Miller*, 395 Ill. at 287.

¶ 48    In *Long*, a collision between an ambulance and a utility truck resulted in injuries to the plaintiff who had been accompanying her ill husband in the ambulance. *Long*, 187 Ill. App. 3d at

---

[3]As this case does not involve liability for vehicle damage, we need not determine whether defendant is a common or private carrier of property. Parenthetically, however, we note that *Navistar* does not stand for the proposition that all tow-truck operators are common carriers of property. In *Navistar*, the defendant tow-truck operator responded to a law-enforcement call to help remove an overturned tractor truck from a public road. *Navistar Financial Corp.*, 153 Ill. App. 3d at 575. The defendant's witness testified that the defendant was "licensed as a common carrier by both the Interstate Commerce Commission and the Illinois Commerce Commission." *Id.* at 576. Here, the record is devoid of any evidence that defendant was licensed as a common carrier or that it undertook tow service at the behest of a government agency responsible for maintaining public order and safety.

14

616-17. The court concluded the ambulance operator was not a common carrier *as to the plaintiff* because ambulance service is ordinarily provided for the patient, and the plaintiff was "merely riding *** incidental to the carriage of her husband." *Id.* at 630.

¶ 49    In *Miller*, a truck hired to transport the plaintiff's horse collided with a train, resulting in injuries to the plaintiff, who was riding in the truck's cab. *Miller*, 395 Ill. at 278-79. The court noted that the truck operator, though licensed to carry property, "was not licensed to carry persons as passengers." *Id.* at 281. Accordingly, it found that "the mere fact defendant agreed to transport plaintiff's horse and saddle *** and to permit [the plaintiff] to ride in the truck, did not mean that he assumed to act as a common carrier of persons." *Id.*

¶ 50    Similarly, here, defendant was not operating as a common carrier of passengers when Penaloza allowed plaintiff to ride along in the tow truck. Notably, defendant was not compensated for giving plaintiff a ride home (see *Long*, 187 Ill. App. 3d at 629), nor was it licensed to transport passengers for hire (see *Miller*, 395 Ill. at 281). Plaintiff's assumption that he would ride in the tow truck was based on a prior request for accommodation rather than a mutually beneficial agreement with defendant. Defendant's invoice reflects itemized charges for towing service alone, with no charge for transporting plaintiff. See *Long*, 187 Ill. App. 3d at 629 (common carriage necessitates transport for hire). Further, the record does not reflect that defendant's tow truck ordinarily carried even incidental passengers. According to plaintiff, Penaloza spent about two minutes clearing his "junk" from the passenger's side before allowing plaintiff to enter the cab. See *Miller*, 395 Ill. at 285-86 ("Defendant's truck was not built for carrying passengers for hire and there is no evidence that, at any time, he had carried passengers for hire."). Finally, plaintiff's text message—"If he's not here in another 10 min[utes], I will get Uber"—shows plaintiff anticipated the need to arrange his own paid transportation. The tow-truck ride was simply a

15

convenience that spared him the expense of securing other means of transportation. See *Long*, 187 Ill. App. 3d at 630; *Miller*, 395 Ill. at 287. Thus, the record allows no dispute that plaintiff's ride in the tow truck was purely an accommodation, incidental to the carriage of the Mercedes.

¶ 51    In summary, the record provides no support for the existence of a "common carrier and passenger" relationship between the parties. Illinois jurisprudence is clear: an affirmative duty may not be imposed absent a special relationship. *Bogenberger*, 2018 IL 120951, ¶ 41. This rule applies most clearly when the actor's conduct did not create the risk of harm. See *Simpkins*, 2012 IL 110662, ¶ 21. Thus, because the record reflects no triable question as to the existence of a special relationship, the circuit court properly declined to impose a duty on defendant.

¶ 52                          C. Alternative Arguments

¶ 53    In closing, we briefly address plaintiff's alternative arguments for reversal.

¶ 54                          1. *"Quasi-Common Carrier"*

¶ 55    Plaintiff argues that even if defendant was not operating as a common carrier, it should be held to the same standard of care as a common carrier because it was "performing the same service as a common carrier." See *Green v. Carlinville Community Unit School District No. 1*, 381 Ill. App. 3d 207, 213 (2008). This argument fails, once again, to distinguish between carriers of passengers and carriers of goods. Defendant was not performing the same service as a common carrier *of passengers*. The record is devoid of any suggestion that defendant was licensed to transport passengers for hire or that its tow truck was designed to carry passengers. See *Miller*, 395 Ill. at 281, 285-86. By providing plaintiff a courtesy ride incidental to the tow service, defendant did not somehow transform into a "quasi-common carrier" of passengers.

¶ 56    Moreover, plaintiff's argument rests on school-bus cases that are far removed from the facts of this case. See *Doe v. Sanchez*, 2016 IL App (2d) 150554; *Green*, 381 Ill. App. 3d 207; *Van*

16

*Cleave v. Illini Coach Co.*, 344 Ill. App. 127 (1951). In each of those cases, the court held that private carriers of *schoolchildren* must exercise the highest standard of care. *Sanchez*, 2016 IL App (2d) 150554, ¶ 27; *Green*, 381 Ill. App. 3d at 213; *Van Cleave*, 344 Ill. App. at 129. The rationale for this exception is obvious. Schoolchildren are uniquely vulnerable; they lack any meaningful choice in transportation, they lack the judgment and autonomy of adults, and they are subject to the near-total control of their carrier. See *Green*, 381 Ill. App. 3d at 213 (finding it "ludicrous" to extend more protection to adult public-bus riders than to children on school buses). Moreover, the very object of school transportation is the safe conveyance of minors. The purpose of tow service, in contrast, is the relocation of disabled vehicles. A tow-truck operator's incidental carriage of an adult, even one with a visual impairment, does not fall within the narrow exception set forth in the line of private-school-bus cases. See *id.* at 214 (noting its holding was limited to the duty "school districts owe student passengers while the students are being transported on a school bus"). In short, the record provides no support for the contention that defendant should be held to the same standard of care as a common carrier.

¶ 57                                   2. *Duty of Ordinary Care*

¶ 58          Next, plaintiff argues defendant owed a duty of ordinary care irrespective of the common-carrier issue. Plaintiff's single-count complaint did not plead a duty of ordinary care; it pleaded only a heightened duty of care. See *Basbagill*, 333 Ill. App. 3d at 15 (party may recover only according to the case it has made for itself by its pleadings); *People ex rel. Klaeren v. Village of Lisle*, 352 Ill. App. 3d 831, 846 (2004) (same); *Ropiy v. Hernandez*, 363 Ill. App. 3d 47, 57 (2005) (same); *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758, ¶ 31 (same). The complaint alleged, "At all relevant times, [defendant], through its agent, servant, and/or employee, owed [plaintiff] the *highest duty of care as a common carrier*." (Emphasis added.) The complaint made no other

17

reference to duty and alleged no facts implicating a duty of ordinary care. The complaint did not allege, for instance, that the tow-truck steps were unsafe or that the poor visibility exacerbating plaintiff's visual impairment resulted from Penaloza's negligent conduct. "Proof without pleadings is as defective as pleadings without proof." *Basbagill*, 333 Ill. App. 3d at 15. If plaintiff wished to proceed on a theory predicated on a duty of ordinary care, it was incumbent on him to include a factual basis for that theory in his pleadings. Plaintiff did not do so.

¶ 59       Instead, plaintiff's complaint sought recovery for an otherwise blameless actor's failure to intervene, a theory sounding in pure nonfeasance. Such pleadings compel a "special relationship" analysis under both a prior-risk-creation framework (*Simpkins*, 2012 IL 110662, ¶ 21) and an affirmative-duty framework (*Bogenberger*, 2018 IL 120951, ¶ 33). There is simply no place for a duty of ordinary care under either framework. "Plaintiff is bound by the allegations in his complaint." *Wells v. IFR Engineering Co.*, 247 Ill. App. 3d 43, 46 (1993). Because plaintiff's complaint rests entirely on imputing an affirmative duty to an actor who did not create the risk of harm, the standard of ordinary care provides no basis for his claim.

¶ 60       Relatedly, plaintiff urges us to consider the traditional duty factors to resolve the duty inquiry. We have already established, however, that we may not consider the traditional duty factors absent a special relationship between the parties. *Bogenberger*, 2018 IL 120951, ¶¶ 37, 41 (citing *Iseberg*, 227 Ill. 2d at 101). We decline the invitation to engage in needless analysis.

¶ 61                              3. *Voluntary Undertaking*

¶ 62       Finally, plaintiff raises for the first time on appeal a voluntary-undertaking theory of liability. He argues Penaloza voluntarily undertook a duty to transport him safely when Penaloza agreed to give him a ride in the tow truck. He further argues a question of fact exists as to whether the scope of defendant's undertaking included ensuring plaintiff's safe exit from the tow truck.

18

¶ 63        Plaintiff contends he preserved the voluntary-undertaking argument as "part and parcel of" what Plaintiff has always maintained is Defendant's duty to exercise ordinary care." We disagree. An argument cannot be preserved as "part and parcel of" a theory that was never pleaded. See *supra* ¶ 58. The complaint pleaded neither an ordinary-duty theory of liability nor a voluntary-undertaking theory. Plaintiff has failed, therefore, to meaningfully advance either theory for our consideration. Moreover, although related, voluntary undertaking and the duty of ordinary care are fundamentally incompatible. A duty of ordinary care is a duty imposed by law, while a voluntary undertaking is the assumption of a duty of ordinary care "not otherwise imposed by law." *Dominick's Finer Foods v. Indiana Insurance Co.*, 2018 IL App (1st) 161864, ¶ 29 (citing *Wakulich v. Mraz*, 203 Ill. 2d 223, 241 (2003)). Because these are analytically distinct issues, raising one does not preserve the other. "[A]n issue not presented to or considered by the circuit court cannot be raised for the first time on review." *Caulkins v. Pritzker*, 2023 IL 129453, ¶ 41. Accordingly, we find this issue forfeited.

¶ 64        Forfeiture notwithstanding, the voluntary-undertaking theory does not warrant reversal. "Under a voluntary undertaking theory of liability, the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Bell v. Hutsell*, 2011 IL 110724, ¶ 12. Although plaintiff disclosed his partial vision loss to Penaloza during the trip, Penaloza did not then undertake to help plaintiff safely alight. A voluntary undertaking is to be narrowly construed. *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 33 (1992). The record is simply devoid of any manifestation of intent by Penaloza to ensure plaintiff's safe exit from the tow truck. Penaloza's agreement to transport plaintiff was incidental to the transport of the Mercedes. In furtherance of this agreement, Penaloza cleared the passenger space to accommodate plaintiff's presence and drove the tow truck to the Mercedes's drop-off location without incident. Upon arrival, Penaloza

19

proceeded to attend to his tow-service duties. He did not assume supervisory control over plaintiff's person or otherwise expand the undertaking beyond incidental transport. In fact, plaintiff's own complaint undercuts his new theory. Setting aside its failure to plead a voluntary undertaking, the complaint specifically alleged, "At no time did [Penaloza] offer to assist the Plaintiff in alighting from the vehicle." Plaintiff is bound by his allegations. *Wells*, 247 Ill. App. 3d at 46. Where Penaloza did not even offer to assist plaintiff alight, no voluntary undertaking to provide such assistance can be inferred.

¶ 65    Plaintiff nevertheless contends a question of fact exists as to the scope of Penaloza's undertaking. This contention lacks evidentiary basis. The record supports only a limited undertaking—namely, the safe transport of plaintiff from the Mercedes's pick-up location to the Mercedes's drop-off location. See *Frye*, 153 Ill. 2d at 33. The duty of ordinary care attendant to providing such transport concerns matters of vehicle operation within the driver's control. See Illinois Pattern Jury Instructions, Civil, No. 70.01 (2d. ed. 1971) (defining the common-law duty of persons operating motor vehicles on public roads). The act of alighting, by contrast, concerns matters of physical mobility ordinarily within the passenger's control. Absent Penaloza's affirmative assumption of responsibility, ordinary experience does not treat an agreement to transport an adult with no apparent mobility limitation as an agreement to monitor or physically manage egress. And while a visual impairment may warrant assistance, it does not create a legal duty where none was assumed. See *Quiroz*, 2022 IL 127603, ¶ 34. Thus, because the record permits only one conclusion as to the scope of the undertaking, there is no triable issue for a jury to resolve.

¶ 66    Our analysis could properly end here. We note, however, that even if the record were read to reflect an unspoken promise to assist plaintiff alight, the voluntary-undertaking theory would

necessarily proceed from Penaloza's failure to fulfill that promise—a classic claim of nonfeasance. See *Bell*, 2011 IL 110724, ¶ 23 (defining *nonfeasance* as the "omission to perform a voluntary undertaking" and *misfeasance* as the "negligent performance of a voluntary undertaking"). In cases of voluntary undertaking involving nonfeasance, "a plaintiff's reliance on the defendant's promise is an independent, essential element." (Internal quotation marks omitted.) *Id.* Here, plaintiff did not rely on any promise by Penaloza to help him alight from the tow truck. He never asked Penaloza to help him alight from the truck. Moreover, when he saw Penaloza occupied with his work responsibilities, plaintiff decided—within a minute after Penaloza had parked the truck—to alight on his own. Plaintiff's lack of reliance is yet another impediment to his voluntary-undertaking argument.

¶ 67        Our conclusion accords with *Mattice v. Goodman*, 173 Ill. App. 3d 236 (1988), in which a 77-year-old woman brought a negligence action for injuries she suffered while attempting to exit a building through a revolving door. *Id.* at 238. The court found the defendant's employee, an elevator starter "whose job description included assisting the elderly and disabled as they went through the doors," had no duty to assist the plaintiff. *Id.* at 238-40. The court commented, "Had [the plaintiff] relied on [the employee] to assist her, and had been injured, she would be entitled to recover. But there was no reliance. [The plaintiff] went through the revolving door without attempting to seek assistance, or seeking any of the available alternatives ***." *Id.* at 240. Similarly, here, plaintiff attempted to exit the truck without requesting assistance and without waiting for Penaloza to complete the tow service. Plaintiff's silent "hope" that Penaloza would pause his work duties to help plaintiff exit the cab is insufficient to impute a voluntary undertaking to Penaloza. On the record before this court, no triable question of fact exists as to this new theory.

¶ 68                                   III. CONCLUSION

¶ 69    Absent a special relationship between the parties, we may not impose on Penaloza an affirmative duty to warn or protect plaintiff from a risk of harm Penaloza did not create. See *Bogenberger*, 2018 IL 120951, ¶ 41; *Simpkins*, 2012 IL 110662, ¶ 21. The record leaves no doubt that plaintiff was not a passenger for hire, and that defendant, whose regular business did not include transporting people for hire, was not a common carrier of passengers. Thus, because no special relationship existed between the parties, Penaloza had no duty to warn or assist plaintiff as he attempted to alight from the tow truck. We affirm the judgment of the circuit court of Du Page County.

¶ 70    Affirmed.

*Tolentino v. Clifford's Towing & Recovery, LLC*, 2026 IL App (3d) 240618

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 22-LA-95; the Hon. Neal W. Cerne and the Hon. Louis B. Aranda, Judges, presiding. |
| **Attorneys for Appellant:** | Robert J. Napleton and Brion W. Doherty, of Napleton & Partners, of Chicago, and Lynn D. Dowd and Patrick C. Anderson, of Naperville, for appellant. |
| **Attorneys for Appellee:** | Michael C. Holy and Carl M. Schultz, of Holy & Schultz, LLC, of Oakbrook Terrace, for appellee. |